TURNER BROADCASTING SYSTEM,
INC., et al., Plaintiffs,

v.

FEDERAL COMMUNICATIONS
COMMISSION, et al.,
Defendants.

DANIELS CABLEVISION,
INC., Plaintiff,

v.

UNITED STATES of America, Defendant.

TIME WARNER ENTERTAINMENT
COMPANY, L.P., Plaintiff,

v.

FEDERAL COMMUNICATIONS
COMMISSION, et al.,
Defendants.

NATIONAL CABLE TELEVISION
ASSOCIATION, INC., Plaintiff,

v.

UNITED STATES of America,
et al., Defendants.

DISCOVERY COMMUNICATIONS,
INC., et al., Plaintiffs,

v.

UNITED STATES of America,
et al., Defendants.

Civ. A. Nos. 92–2247, 92–2292, 92–
2494, 92–2495 and 92–2558.

United States District Court,
District of Columbia.

April 8, 1993.

Bruce D. Sokler, Peter Kimm, Jr., Gregory A. Lewis, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., Bertram W. Carp, Turner Broadcasting System, Inc., Washington, DC, Mary Ann Zimmer, Arts & Entertainment Network, New York City, Debbie Lee, Black Entertainment Television, Washington, DC, Christopher Fager, E! Entertainment Television, Inc., Los Angeles, CA, Jane Tollinger, Hearst/ABC–Viacom Entertainment Services, Astoria, NY, Louis A. Isakoff, International Family Entertainment, Inc., Virginia Beach, VA, Bruce D. Collins, National Cable Satellite Corp., Washington, DC, Neal S. Grabell, QVC Network, Inc., West Chester, PA, Louis F. Ryan, The Travel Channel, Inc., Atlanta, GA, Stephen A. Brenner, USA Networks, New York City, for Turner Broadcasting.

John P. Cole, Jr., John D. Seiver, Cole, Raywid & Braverman, Washington, DC, for Daniel Cablevision.

Brian Conboy, Wilkie Farr & Gallagher, Washington, DC, Robert D. Joffe, Stuart W. Gold, Stephen S. Madsen, Cravath, Swaine & Moore, New York City, for Time Warner.

H. Bartow Farr, III, Joel I. Klein, Klein, Farr, Smith & Taranto, Daniel L. Brenner, Michael S. Schooler, Diane B. Burstein, National Cable Television Association, Inc., Washington, DC, for National Cable Television.

Allan A. Tuttle, Garret G. Rasmussen, Kenneth L. Glazer, G. Kendrick MacDowell, Patton, Boggs & Blow, Washington, DC, for Discovery.

Stuart E. Schiffer, Acting Asst. Atty. Gen., Civ. Div., Jay B. Stephens, U.S. Atty., Theodore C. Hirt, John R. Tyler, Patricia Arzuaga, Washington, DC, for United States and FCC.

Rex E. Lee, Robert A. Beizer, Carter G. Phillips, Mark D. Hopson, Sidely & Austin, James J. Popham, Association of Indepen-

dent, Television Stations, Inc., Washington, DC, for Association of Independent Television Stations, Inc.

Bruce J. Ennis, Jr., David W. Ogden, Donald B. Verrilli, Jr., Ann M. Kappler, Jenner & Block, Henry L. Baumann, Benjamin F.P. Ivins, Jack N. Goodman, National Association of Broadcasters, Washington, DC, for Nat. Ass'n of Broadcasters.

Andrew Jay Schwartzman, Gigi B. Sohn, Media Access Project, Washington, DC, for Consumer Federation of America, National Council of Senior Citizens, International Association of Machinists and Aerospace Workers, AFL–CIO, United Church of Christ.

Jonathan D. Blake, Gregory M. Schmidt, Mark H. Lynch, Covington & Burling, Marilyn Mohrman–Gillis, Association of America's Public Television Stations, Washington, DC, Paula A. Jameson, Nancy Howell Hendry, Public Broadcasting Service, Alexandria, VA, Paul E. Symczak, Corporation for Public Broadcasting, Washington, DC, for Association of America's Public Television Stations, PBS, Corporation for Public Broadcasting.

Henry A. Solomon, Theodore D. Kramer, Haley, Bader & Potts, Arlington, VA, for Community Broadcasters Ass'n.

Roy F. Perkins, Herndon, VA, for Triplett & Associates.

Robert T. Perry, Brooklyn, NY, Paul Broyles, International Broadcasting Network, Houston, TX, for Local Community Broadcasters.

Steven J. Hyman, Robert I. Freedman, Janet C. Neschis, Paul H. Levinson, Leavy, Rosenzweig & Hyman, New York City, Jonathan L. Wiener, Goldberg, Godles, Wiener & Wright, Washington, DC, for National Interfaith Cable Coalition.

Robert Alan Garrett, Arnold & Porter, Washington, DC, for Local Governments (National League of Cities, et al.)

John B. Richards, Shelia A. Millar, Arthur S. Garrett III, Keller and Heckman, Washington, DC, for National Rural Telecommunications Co-op.

Theodore D. Kramer, Haley, Bader & Potts, Arlington, VA, for TV 14, Inc.

Philip R. Hochberg, James E. Meyers, Baraff, Koerner, Olender & Hochberg, P.C., Washington, DC, for Encore Media Corp.

Teresa D. Baer, Miller & Holbrooke, Washington, DC, Edward P. Kearse, John L. Grow, New York State Com'n on Cable Television, Albany, NY, for National Ass'n of State Cable Agencies.

Nicholas W. Allard, Paul J. Sinderbrand, Keck, Mahin & Cate, Washington, DC, for Wireless Cable Ass'n Intern., Inc.

Colby M. May, May & Dunne, Chartered, Washington, DC, for Trinity Christian Center, etc.

James Johnston, Washington, DC, amicus curiae, for Atlanta Interfaith Broadcasters.

Larraine S. Holbrooke, Tillman L. Lay, Joseph Van Eaton, Miller & Hollbrooke, James N. Horwood, Spiegel & McDiarmid, Washington, DC, James Hahn, Pedro B. Echeverria, City of Los Angeles, Los Angeles, CA, amicus curiae, for City of Los Angeles, etc.

Norman M. Sinel, Robert Alan Garrett, Preeta D. Bansal, Arnold & Porter, Washington, DC, amicus curiae, for City of New York.

Alan K. Weitz, Ginsburg Feldman & Bress, Washington, DC, Andrew J. Levander, Shari L. Steinberg, Adam B. Rowland, Michael Cohen, New York City, amicus curiae, for Liberty Cable Co.

Michael Davidson, Senate Legal Counsel, Claire M. Sylvia, Asst. Senate Legal Counsel, Washington, DC, amicus curiae, for United States Senate.

Before WILLIAMS, Circuit Judge, and JACKSON and SPORKIN, District Judges.

## MEMORANDUM AND ORDER

JACKSON, District Judge.

Sections 4 and 5 of the Cable Television Consumer Protection and Competition Act of 1992, Pub.L. No. 102–385, 106 Stat. 1460 (to be codified at 47 U.S.C. §§ 534 & 535) ("the 1992 Cable Act" or "the Act") require cable television system operators to carry the video signals of certain commercial and noncommercial educational television broadcast stations requesting that their signals be carried. The plaintiffs in these five consolidated lawsuits contend that these mandatory carriage (or "must-carry") provisions violate

their First Amendment rights. Upon consideration of the entire record,[1] the Court holds that sections 4 and 5 of the 1992 Cable Act do not violate the plaintiffs' First Amendment rights.

### Background

On October 5, 1992, Congress overrode a Presidential veto to enact the 1992 Cable Act. The Act subjects the cable industry to extensive regulation. Among other things, it subjects certain cable system operators to rate regulation by the FCC and by municipal franchising authorities; it imposes restrictions on distributors of cable programming that are affiliated with cable operators; and it directs the FCC to promulgate regulations imposing minimum technical standards for operators of cable systems.

Sections 4, 5, and 6 of the Act limit the freedom of cable operators to refuse to carry the signals of local broadcast stations, and, as a corollary, prevent cable operators from carrying broadcast signals without a broadcaster's consent.[2] The plaintiffs' constitutional challenge to these three sections is the matter presently to be addressed by this opinion.

Section 4 of the Act requires all cable system operators with more than 12 channels to carry, upon request, the signals of licensed "local" commercial broadcast television stations whose signal is received over-the-air in the same television market as the cable system.[3] The operator need not devote more than one-third of its active useable channels to deliver local broadcast signals, but if there are not enough local broadcast stations to fill the one-third set-aside, the operator must carry the signal of one or two "qualified" low power broadcast stations.[4] Cable systems with 12 or fewer channels must deliver the signals of at least three local commercial broadcast stations unless the cable system has 300 or fewer subscribers, in which case it is not subject to the requirements of section 4 at all. An operator must carry the entire programming schedule of each commercial station it is required to carry, and it may not accept or request payment for doing so. Every commercial broadcast station having a right to mandatory carriage must be carried by the cable operator, at the station's election, on its current over-the-air channel position, at the channel position it occupied on July 19, 1985, or at the channel position it occupied on January 1, 1992.

Section 5 of the Act requires operators of cable systems able to deliver signals on more

1. During the pendency of this litigation, no fewer than 16 parties have sought to intervene as plaintiffs or defendants. These applications have been held in abeyance, but all of these applicants, together with several *amicus curiae* applicants, have been granted leave to participate herein as *amici*. All applicants for intervention have been permitted to file motions and memoranda as exhibits to their motions for intervention, and the Court has considered the entire record amassed in this case. The Court has, contemporaneously with the filing of this opinion, issued an order granting all pending motions for intervention insofar as the applicants seek to challenge or defend the must-carry provisions.

2. "Broadcast" stations reach their viewers by transmitting electromagnetic waves through the air for interception by television receivers, usually equipped with antennas. Other entities in the business of producing video images, generically referred to herein as "programmers," do not have access to the electromagnetic spectrum, and must find alternative means by which to reach viewers. Most often, programmers will arrange to have their signals transmitted by satellite to receptor dishes across the world. Cable "operators" develop a package of programming services by creating their own programming, by capturing the satellite signals of different programmers, and by capturing the broadcast signals of local and distant broadcasters on master antennas. These programming packages are generally sent by cable operators to their subscribers by coaxial cables strung along public rights-of-way.

3. An operator's television market is defined by regulation, *see* 47 C.F.R. § 73.3555(d)(3)(i) (1992), but the FCC is empowered to make special market determinations upon request, *see* 1992 Cable Act § 4 (definitions) (to be codified at 47 U.S.C § 534(h)(1)(C)).

4. Low power television stations are small broadcast operations with a limited geographic transmission range. These stations are licensed on a secondary basis; they cannot interfere with the signals of any full power station and must give way to any full power station attempting to occupy the same frequency. *See generally* 47 C.F.R. §§ 74.701–74.781 (1992); In the Matter of An Inquiry into the Future Role of Low Power Television Broadcasting and television Translators in the National Telecommunications System, BC Docket No. 78–253, 51 Rad.Reg. 476 (P & F) (April 26, 1982) [hereinafter *1982 LPTV Inquiry* ].

than 36 channels to carry the signals of every local non-commercial educational broadcast television station requesting carriage,[5] unless the educational station's programming substantially duplicates that of another station carried by the system. Systems with 12 or fewer channels must carry one qualified non-commercial station, and systems having 12 to 36 channels must carry between one and three such stations. Section 5, like section 4, directs cable system operators to carry the entire programming schedule of the broadcast stations they are required to carry, and similarly prohibits operators from accepting payment in exchange for carriage. Each non-commercial station having a mandatory carriage right must be carried, at its election, on its current over-the-air channel position or on its channel position as of July 19, 1985.

Section 6 of the Act, which becomes effective on October 5, 1993, prohibits cable operators from retransmitting the signals of any commercial broadcasting station without obtaining the station's consent. In conjunction with section 4, section 6 provides local broadcasters with an option to request mandatory (but uncompensated) carriage on a system or to negotiate a carriage agreement with the operator. (Presumably, cable operators will want to carry the signals of larger, viewer-popular broadcasters and will pay for the privilege;[6] less popular broadcasters will be able to force their carriage by making a carriage demand under section 4.).

On the same day that the 1992 Cable Act became law, Turner Broadcasting System, Inc., the owner of several cable programming operations, brought this case against the FCC and the United States, challenging sections 4, 5, and 6 as unconstitutional under the First Amendment, asking for declaratory and injunctive relief.[7] Within the ensuing five weeks, four other plaintiff groups—comprised of cable system operators and programmers—brought similar suits seeking similar relief.[8] In addition to challenging sections 4, 5 and 6 of the Act, two of these plaintiff groups brought First Amendment challenges to multiple other provisions of the 1992 Act and to certain provisions of the Cable Communications Policy Act of 1984, Pub.L. No. 98–549, 98 Stat. 2782 ("the 1984 Act").[9] This three-judge U.S. District Court ("the Court" or "this Court") was convened pursuant to § 23 of the 1992 Cable Act, which commands that a three-judge court hear "any civil action challenging the constitutionality of section [4] or [5]" of the 1992 Act.

On November 23, 1992, this Court consolidated these five cases for the "purpose of determining issues related to the constitutionality of sections 4 and 5 of the [Act], and any matters determined to be ancillary thereto." *Turner Broadcasting Sys., Inc. v. FCC,* CA No. 92–2247, order at 2 (D.D.C. Nov. 23, 1992) (three-judge court). Four of the five plaintiff groups filed comprehensive preliminary injunction motions, but a hearing on those motions as to the must-carry provisions was postponed indefinitely upon the Court's approval of the parties' assent to a "standstill order" proposed by the parties. *See id.,* standstill order (D.D.C. Dec. 9, 1992) (three-judge court). On December 15, 1992,

---

5. A qualified noncommercial educational station is (1) a station licensed by the FCC as such, owned by a public agency or nonprofit entity, and eligible to receive a grant from the Corporation for Public Broadcasting; or (2) a station owned and operated by a municipality which transmits predominantly noncommercial programs for educational purposes. 1992 Cable Act § 5 (definitions) (to be codified at 47 U.S.C. § 535(*l*)(1)).

6. Prior to the 1992 Act, cable operators were free to carry the signals of local broadcasters subject only to the "compulsory license" provisions of the copyright law. *See* 17 U.S.C. § 111 (1988). Under these provisions, operators may transmit broadcast signals if they pay royalty fees determined pursuant to an administrative schedule.

7. *Turner Broadcasting Sys., Inc. v. FCC,* CA No. 92–2247. Turner later amended its complaint to add several additional cable programmers as plaintiffs.

8. *Daniels Cablevision, Inc. v. United States,* CA No. 92–2292; *Time Warner Entertainment Co. v. FCC,* CA No. 92–2494; *National Cable Television Assoc. v. United States,* CA No. 92–2495; *Discovery Communications, Inc. v. United States,* CA No. 92–2558.

9. *Time Warner,* CA No. 92–2494; *Discovery,* CA No. 92–2558.

this Court declined to exercise jurisdiction over any claim other than the must-carry claims, *see Turner Broadcasting Sys., Inc. v. FCC,* 810 F.Supp. 1308 (D.D.C.1992) (three-judge court).[10]

The matter, i.e., the constitutionality of sections 4 and 5, is now before the Court on the motions for summary judgment of all five plaintiff groups; on the cross-motions for summary judgment of several intervenor-defendants; on the federal defendants' cross-motion to dismiss; on an intervenor-plaintiff's motion for preliminary injunction of sections 4 and 5 on "religion clause" grounds; and on an intervenor-defendant's motion for summary judgment on a cross-claim.

## I.

The plaintiff cable system operators and programmers contend that the must-carry provisions are, on their face, violative of their First Amendment rights to freedom of speech. The primary evil of those provisions, they assert, is that they force cable system operators to devote a portion of their finite signal-carrying capacity to deliver the signals of a privileged class of competing "speakers," i.e., over-the-air broadcasters, thus diminishing the number of channels remaining available to them for other programming they might prefer to carry. Must-carry also violates the First Amendment rights of the operators, they say, because it inhibits the operators' "editorial discretion" to determine what programming messages to provide to their subscribers,[11] compelling them perforce to deliver some programming they might otherwise choose not to carry. And the programmers argue that must-carry

exalts broadcasters to preferred status as "speakers" by awarding them favored cable channel positions the programmers covet.

The concept of governmentally ordained mandatory carriage of broadcast signals is not a novel threat to the cable industry. The FCC first began to experiment with must-carry rules in the early 1960s.[12] The perceived need for must-carry today is based on the same premise that gave rise to it then: that local broadcast stations, unable to secure carriage on cable systems serving the same viewer markets, will, over time, lose their audiences and perish. *Compare* 1992 Cable Act § 2(a)(15) *and* S.Rep. No. 92, 102d Cong., 1st Sess. 42–46 *and* H.R.Rep. No. 628, 102d Cong., 2d Sess. 50–57, U.S.Code Cong. & Admin.News 1992, 1133, 1175–1179 *with Rules Re Microwave–Served CATV, Dockets Nos. 14895 and 15233,* 38 F.C.C. 683 ¶ 51, 57, 58–82 (1965). As the audiences of broadcasting stations decline, so the reasoning goes, their advertising revenues will decrease correspondingly. Local over-the-air broadcasting operations, once they become unprofitable, will expire. Cable carriage of local broadcasting was then and is still now thought by its proponents to be essential not merely to ensure the continuing availability of programming with a "local" flavor to cable system subscribers, but also to preserve the vitality of a free source of over-the-air programming to television viewers unwilling or unable to obtain a cable connection.

Not surprisingly, the parties have expended considerable effort and resources arguing over the level of First Amendment scrutiny to be applied to speech regulation in the

---

**10.** All motions for preliminary injunction with respect to sections other than 4 and 5 were denied by the single-judge district court. *See Time Warner Entertainment Co. v. FCC,* 810 F.Supp. 1302 (D.D.C.1992) (Jackson, J.). A decision in these cases on the merits is forthcoming.

All of the plaintiffs challenge section 6, the retransmission consent provision, on the ground that it is not severable from section 4, and must be struck if section 4 is declared unconstitutional. Because the Court holds that section 4 is constitutional, plaintiffs' challenge to section 6 must fail, and the Court expresses no opinion on the severability issue. One of the plaintiffs, Daniels' Cablevision, has brought an independent constitutional challenge to section 6. Pursuant

to the Court's jurisdictional ruling, this challenge is before the single-judge court.

**11.** The plaintiffs note that the 1992 Act not only requires operators to carry local broadcast stations, it requires operators to carry these stations on a "basic service tier" that must be made available to all subscribers. 1992 Cable Act § 3(a) (to be codified at 47 U.S.C. § 543(b)(7)(A)).

**12.** The early development of must-carry regulation is comprehensively traced in *Quincy Cable TV, Inc. v. FCC,* 768 F.2d 1434, 1438–43 (D.C.Cir.1985), *cert. denied,* 476 U.S. 1169, 106 S.Ct. 2889, 90 L.Ed.2d 977 (1986).

cable context. The plaintiffs contend that the must-carry provisions must be subjected to exacting First Amendment scrutiny; if they are not *per se* unconstitutional, they are assuredly permissible only if found to have been precisely drawn to serve a compelling government interest, and to go no further. *See, e.g., Sable Communications v. FCC*, 492 U.S. 115, 126, 109 S.Ct. 2829, 2836, 106 L.Ed.2d 93 (1989); *Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575, 585, 103 S.Ct. 1365, 1371, 75 L.Ed.2d 295 (1983). The defendants respond that if the First Amendment is implicated at all in this case, the must-carry provisions need only be judged by the interest-balancing traditionally applied to content-neutral speech regulation or legislation ostensibly unrelated to expression that is discovered to impose incidental burdens on speech. The nature of this inquiry, originating in *United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), and refined in *Ward v. Rock Against Racism*, 491 U.S. 781, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989), is to uphold such regulation when shown to promote a significant government interest and not to burden substantially more speech than necessary to vindicate that interest. *Rock Against Racism*, 491 U.S. at 799, 109 S.Ct. at 2758.

## II.

In 1989, Congress began the first in a series of several hearings to assess the video programming distribution landscape in light of the 1984 Cable Act.[13] After an exhaustive fact-finding process including hearings held over three years,[14] the 1992 Act was passed.[15] Congress' principal finding was that, for a variety of reasons, concentration of economic power in the cable industry was preventing non-cable programmers from effectively competing for the attention of a television audience. *See* 1992 Cable Act §§ 2(a)(2), (4), & (15). *See generally* 1992 Cable Act § 2(a); 1991 S.Rep. No. 92; 1992 H.R.Rep. No. 628, 102d Cong., 2d Sess. (1992); H.R.Rep. No. 862 (conference report).

Congress specifically found that cable had become the "dominant nationwide video medium." 1992 Cable Act § 2(a)(3); *see* 1991 S.Rep. No. 92 at 3, U.S.Code Cong. & Admin.News 1992 at 1135. Almost 56,000,000 households—60 percent of the households with televisions—receive cable television, 1992 Cable Act § 2(a)(3), and cable service is available to almost 90% of the nation, 1991 S.Rep. No. 92 at 3. In those homes receiving video signals by cable, cable has all but supplanted over-the-air broadcast television reception. 1992 Cable Act § 2(a)(17).

Congress also found that despite the dominance of cable, there is insufficient competition within the cable industry. First, there is little competition between cable operators. For many reasons "including local franchising requirements and the extraordinary expense of constructing more than one cable television system to serve a particular geographic area," most regions of the country are served by one cable operator only. 1992 Cable Act § 2(a)(2).[16] Second, the industry

**13.** *See Media Ownership: Diversity and Concentration: Hearing before the Subcommittee on Communications of the Senate Committee on Commerce, Science and Transportation*, 101st Cong., 1st Sess. (1989) [hereinafter *Hearing of June 1989*].

**14.** *See, e.g., Hearings before the Subcommittee on Telecommunications and Finance of the House Committee on Energy and Commerce*, 102d Cong., 2d Sess. (1991); *S. 12: Hearing before the Subcommittee on Communications of the Senate Committee on Commerce, Science and Transportation*, 101st Cong., 1st Sess. (1991); *"Must-Carry:" Hearing before the Subcommittee on Communications of the Senate Committee on Commerce, Science and Transportation*, 101st Cong., 1st Sess. (1989) [hereinafter *Hearing of October 25, 1989*]. *See generally* 1991 S.Rep. No. 92 at 3–5 (1991) (discussing the 11 Senate hearings, held over two years, related to cable television); Debates, 138 Cong.Rec. S400, S635 (statement of Sen. Inouye) (daily ed. Jan. 30, 1992) ("[T]he bill before us is the result of 13 days of hearings and 113 different witnesses. We have had countless numbers of communications experts and lawyers look over the measure. We have conferred with, in addition to the 113 witnesses, at least 500 knowledgeable citizens.")

**15.** *See generally* 1991 S.Rep. No. 92; 1992 H.R.Rep. No. 628 (1992); 1992 H.R.Rep. No. 862, 102d Cong., 2d Sess. (1992) (conference report).

**16.** Evidence received by Congress indicated that less than 1% of the cable operators in the nation face competition from other operators. *Federal Communications Commission Report*, MM Dock-

has become horizontally concentrated—many operators share common ownership. *See* 1992 Cable Act § 2(a)(4).[17] Third, the industry is becoming vertically integrated. 1992 Cable Act § 2(a)(5). Many large entities that operate cable franchises also own and operate programming enterprises. *Id.,; see also FCC Report, supra* note 16, at ¶¶ 77–80.

Congress determined that geographic monopolization, horizontal concentration and vertical integration have created barriers to entry for non-cable programmers, primarily broadcasters, attempting to obtain carriage on cable. Vertical integration contributes to this cable "bottleneck" by providing cable operators with economic incentive to grant affiliated programmers access to their systems while denying it to others. 1992 Cable Act § 2(a)(5). Similarly, horizontal concentration and the absence of effective competition among operators have obstructed broadcaster access by creating a climate conducive to another anti-competitive operator practice. Cable operators compete with broadcasters for advertising revenue. *Id.* at § 2(a)(14). Consequently, operators have an economic incentive to refuse carriage of broadcasters' signals to reduce broadcast viewership, thus attracting advertising dollars that otherwise would go to broadcasters. *Id.* at § 2(a)(15).

In summary, Congress concluded that the economic forces at work and the market conditions they had already produced had placed free local broadcast television in serious jeopardy. *Id.* at § 2(a)(16). It determined that mandatory carriage was necessary to remedy unfair trade practices, to preserve local broadcasting for those who do not receive cable television, *id.* § 2(a)(12), as well as those who do, *id.* at § 2(a)(7), and to ensure that the public will continue to have access to a wide diversity of sources of video programming, *id.* at § 2(a)(6)–(11).

■ This Court is of the opinion that, in enacting the 1992 Cable Act, Congress em-

ployed its regulatory powers over the economy to impose order upon a market in dysfunction, but a market in a commercial commodity nevertheless; not a market in "speech." The commodity Congress undertook to regulate is the means of delivery of video signals to individual receivers. It is not the information the video signals may be used to impart. That the video signals can only be used to convey a message is of no particular significance. The same is true of printing presses, or broadcast transmitters; loudspeakers, or movie projectors. Yet no one doubts that Congress could regulate a market in those commodities in danger of chaos or capture without being accused of attempting to infringe the First Amendment freedoms of those by whom they will be used to express protected "speech." The Cable Act of 1992 is simply industry-specific antitrust and fair trade practice regulatory legislation: to the extent First Amendment speech is affected at all, it is simply a by-product of the fact that video signals have no other function than to convey information.

In other words, the Court holds that the must-carry provisions are essentially economic regulation designed to create competitive balance in the video industry as a whole, and to redress the effects of cable operators' anti-competitive practices. The regulation is justified by the existing structure of the cable business itself, and by the market peculiarities resulting from the technological differences in the manner in which different video signal distributors deliver their products to their viewers' receivers. So perceived, the Court concludes that the must-carry provisions are, in intent as well as form, unrelated (in all but the most recondite sense) to the content of any messages that these embattled cable operators, broadcasters, and programmers have in contemplation to deliver.

et No. 89–600 ¶ 98 [hereinafter *FCC Report*]; *Hearing of October 25, 1989, supra* note 14, at 40. *See generally* Debates, 138 Cong.Rec. S400, S436 (comments of Sen. Gorton) (daily ed. Jan. 30, 1992) (stating that although there are 11,000 cable operators in the nation, there are only 53 communities which are served by more than one).

17. *See also Hearings of June 1989, supra* note 13, at 78 (testimony of Prof. Bagdikian) (testifying that the operators serving one-third of the cable subscribers in the nation are owned by two cable companies).

## III.

■ That the First Amendment is to some extent implicated whenever a government endeavors to regulate a cable industry component, however, is a proposition now too well-established to reconsider.[18] But although many courts have considered the application of the First Amendment to various laws regulating cable,[19] the question of the First Amendment standard to be applied to compulsory signal-carriage requirements has yet to be definitively answered. Despite twice confronting the issue, the D.C. Circuit has avoided its resolution. *See Century Communications Corp. v. FCC*, 835 F.2d 292 (D.C.Cir.1987), *clarified*, 837 F.2d 517 (D.C.Cir.), *cert. denied*, 486 U.S. 1032, 108 S.Ct. 2014, 100 L.Ed.2d 602 (1988); *Quincy Cable TV, Inc. v. FCC*, 768 F.2d 1434 (D.C.Cir.1985), *cert. denied*, 476 U.S. 1169, 106 S.Ct. 2889, 90 L.Ed.2d 977 (1986).[20]

It appears to this Court that the must-carry provisions of the 1992 Cable Act squarely present this fundamental issue, and these cases demand that it be resolved. The Court today holds that the government need not demonstrate that it has used the least restrictive means to accomplish what is, primarily and essentially, economic regulation of an industry in the business of delivering video signals. The Court concludes that sections 4 and 5 of the 1992 Act will pass constitutional muster if they satisfy the criteria established in *O'Brien* and its progeny.

To be sure, in *Quincy* and *Century*, the D.C. Circuit held FCC rules requiring cable operators to carry the signals of local broadcasters to be unconstitutional. Neither case, however, is controlling here; the court of appeals was careful, in both opinions, to note that must-carry rules are not *per se* unconstitutional. *Century*, 835 F.2d at 304; *Quincy*, 768 F.2d at 1463. The court of appeals simply held, in both cases, that the FCC had failed to make a record demonstrating the existence of a governmental interest of sufficient moment—whether "compelling" or merely "significant"—to warrant such First Amendment burdens as were imposed by its regulations, or to demonstrate that the means it had chosen to employ to its putative end were necessary at all.

The record in support of the 1992 Cable Act, in contrast, was made by Congress. Federal courts do not ordinarily review the adequacy of the record before Congress to support the laws it enacts.

---

**18.** *See City of Los Angeles v. Preferred Communications, Inc.*, 476 U.S. 488, 494, 106 S.Ct. 2034, 2038, 90 L.Ed.2d 480 (1986) (holding that operators' exercise of editorial control "plainly implicate[s] First Amendment interests."); *Quincy*, 768 F.2d at 1452–53; *see also Leathers v. Medlock*, —— U.S. ——, —— – ——, 111 S.Ct. 1438, 1442–43, 113 L.Ed.2d 494 ("[c]able television provides to its subscribers news, information, and entertainment. It is engaged in 'speech' under the First Amendment...."). Although the defendants vigorously contend that the plaintiff programmers have raised no First Amendment issues because their only claim is that broadcasters have been favorably treated, this argument misses the point because it mischaracterizes the programmers' claims. The programmers do not merely contend that Congress has failed to provide a benefit to programmers that it has provided to others. Instead, the programmers contend that Congress has, by increasing broadcaster speech in a limited forum, *reduced* the speech of the programmers. This is a First Amendment claim. *Quincy*, 768 F.2d at 1451–52.

**19.** *See, e.g., Preferred Communications, Inc.*, 476 U.S. 488, 106 S.Ct. 2034; *Chicago Cable Communications v. Chicago Cable Comm'n*, 879 F.2d

1540 (7th Cir.1989) *cert. denied*, 493 U.S. 1044, 110 S.Ct. 839, 107 L.Ed.2d 835 (1990); *Century Communications Corp. v. FCC*, 835 F.2d 292 (D.C.Cir.1987), *clarified*, 837 F.2d 517 (D.C.Cir.), *cert. denied*, 486 U.S. 1032, 108 S.Ct. 2014, 100 L.Ed.2d 602 (1988); *Quincy Cable*, 768 F.2d 1434; *Community Communications Co. v. City of Boulder*, 660 F.2d 1370 (10th Cir.1981), *cert. dismissed*, 456 U.S. 1001, 102 S.Ct. 2287, 73 L.Ed.2d 1296 (1982); *Home Box Office, Inc. v. FCC*, 567 F.2d 9 (D.C.Cir.), *cert. denied*, 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977); *Telesat Cablevision, Inc. v. Riviera Beach*, 773 F.Supp. 383 (S.D.Fla.1991); *Century Federal, Inc. v. Palo Alto*, 710 F.Supp. 1552 (N.D.Cal.1987); *Group W Cable, Inc. v. Santa Cruz*, 669 F.Supp. 954 (N.D.Cal.1987).

**20.** As discussed below, in both cases, the court held FCC must-carry regulations unconstitutional without finding it necessary to define the precise level of First Amendment scrutiny to be applied to them. *See also Preferred Communications, Inc.*, 476 U.S. 488, 106 S.Ct. 2034 (holding that municipal restrictions on cable operator franchise access implicate First Amendment interests, but expressing no opinion on the level of scrutiny to be applied).

## IV.

■ All parties agree (at least, the plaintiffs concede) that the must-carry provisions are not *viewpoint*-based; must-carry rights are conferred upon all full-power local broadcasters, and the obligations upon most cable operators, regardless of any views expressed in the programming of either. The provisions do not compel the carriage of any particular messages nor do they impose any burden on operators or programmers on the basis of the messages they or the broadcasters propose to transmit. Nevertheless, a law need not be viewpoint-based to be subject to strict First Amendment scrutiny. It may, for example, be considered content-based and subjected to strict scrutiny if it purports to restrict a particular type or character of speech, irrespective of the position taken on any issue. *Consolidated Edison Co. v. Public Serv. Comm'n,* 447 U.S. 530, 537, 100 S.Ct. 2326, 2333, 65 L.Ed.2d 319 (1980) (public policy leaflets accompanying utility bills); *Boos v. Barry,* 485 U.S. 312, 319, 108 S.Ct. 1157, 1162–63, 99 L.Ed.2d 333 (1988) (placards embarrassing to or disparaging of a foreign government) (plurality opinion).

■ The plaintiffs contend that strict scrutiny applies because the must-carry provisions compel an operator to utter "speech" not of its choosing; because they alter an operator's editorial decision-making about what to say; and because they favor the speech of broadcasters over that of operators and programmers. But none of the epithets invoked by the plaintiffs—"compelled speech," or "editorial discretion," or "speaker-partiality"—are talismans automatically necessitating strict scrutiny. Strict scrutiny applies only if governmental regulation is overtly content-based or presents an opportunity for official censorship. A compulsory speech requirement, or one imposing upon the discretion of a speaker to say only what he wishes, it appears, is to be strictly scrutinized only if it appears that the government has prescribed the content—either the message or the subject matter—of the speech to be spoken.[21] Examined carefully, all of the compelled speech and editorial discretion cases cited by the plaintiffs can be seen to have involved regulation telling the speaker *what* to say or at least what to talk about. *See Riley v. National Fed'n of the Blind,* 487 U.S. 781, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988) (state law requiring charitable fundraisers to disclose percentage of receipts actually devoted to good works); *Pacific Gas & Elec. Co. v. Public Util. Comm'n,* 475 U.S. 1, 10–11 & n. 7, 106 S.Ct. 903, 908–09 & n. 7, 89 L.Ed.2d 1 (1986) (plurality opinion) (state regulation requiring utility to mail fundraising appeals of its rate-making opponents); *Wooley v. Maynard,* 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977) (state law requiring motorist to display bellicose state motto on license plates); *Miami Herald Publishing Co. v. Tornillo,* 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974) (state law requiring newspaper to carry replies of political candidates it had opposed editorially).

These cases stand in sharp contrast to *PruneYard Shopping Center v. Robins,* 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980), in which the Supreme Court upheld a California constitutional provision interpreted to protect speech and petitioning at a privately owned shopping center. Significantly, the speaker's right to speak on the objecting owner's property upheld in *PruneYard* had nothing to do with the content or subject matter of his speech, and there was no danger that, in affording the speaker access to his shopping center, the owner would be affected to any degree in his ability to speak his own piece.

■ "Speaker-partial" regulations, or those that purportedly favor one group of speakers at the expense of others, similarly are not subject to strict scrutiny unless they are content-based. *Walsh v. Brady,* 927 F.2d 1229, 1236 (D.C.Cir.1991); *see id.* at

21. Compelled speech presents two distinct content-related dangers. First, it may cause a speaker to say things he or she might otherwise choose not to say. *See Wooley v. Maynard,* 430 U.S. 705, 715, 97 S.Ct. 1428, 1435, 51 L.Ed.2d 752 (1977). Second, it may deter a speaker from engaging in speech that is inconsistent with the compelled speech. *See Miami Herald Publishing Co. v. Tornillo,* 418 U.S. 241, 256–57, 94 S.Ct. 2831, 2839, 41 L.Ed.2d 730 (1974); *Pacific Gas & Elec. Co. v. Public Util. Comm'n,* 475 U.S. 1, 10–11 & n. 7, 106 S.Ct. 903, 908–09 & n. 7, 89 L.Ed.2d 1 (1986) (plurality opinion).

1238–39 (Williams, J., concurring). *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), the principal speaker-partiality case cited by the plaintiffs, is not to the contrary. In *Buckley,* the Supreme Court struck down a statutory provision imposing a $1,000 limit on the amount which an individual could spend to support a particular political candidate. The government sought to justify the provision on the ground that it was necessary to provide those of modest means with an opportunity to participate in the political process equal to that of the wealthy. *Id.* at 48, 96 S.Ct. at 648. Implicit in this reasoning, of course, was a Congressional judgment that the speech of those spending over $1,000 was not only "louder" than those spending less than $1,000, but was also different and, more importantly, more sinister. *See id.* at 16–17, 96 S.Ct. at 633–34. *Buckley* is thus a case in which the government sought, in effect, to suppress the expression of a meretricious idea. Speaker partiality alone, however, absent evidence that the government's distinction between groups of speakers is related to what the speakers are saying, is insufficient to trigger strict scrutiny.[22]

■ A regulation is deemed to be content-neutral if it is addressed to ends unrelated to the content of expression upon which it may have an effect. *Ward v. Rock Against Racism,* 491 U.S. at 791, 109 S.Ct. at 2753; *Texas v. Johnson,* 491 U.S. 397, 407, 109 S.Ct. 2533, 2540–41, 105 L.Ed.2d 342 (1989). As the Court has previously noted, because the record indicates that Congress' primary purpose in enacting must-carry was to restore competitive balance and assure a functional market in the distribution of video signals, whatever might be said with those signals, the must-carry provisions appear to be unrelated to the content of the expression they will affect.

### V.

■ The plaintiffs argue that the government's asserted interest in "promoting widespread dissemination of information from diverse sources," Federal Defendant's Memorandum at 33, betrays a content-based purpose. That Congress has found it necessary to preserve local broadcast television to promote "diversity," even for those who receive cable television, they contend, indicates that Congress perceives some content difference between the messages of "local" broadcasters and cable programmers.[23]

---

22. The plaintiffs contend that any regulation that singles out a particular segment of the press, like cable operators, and imposes burdens on them alone, is presumptively unconstitutional. Although the Supreme Court has applied such a presumption to certain taxes that single out members of the press, *see Minneapolis Star,* 460 U.S. 575, 103 S.Ct. 1365 (1983). *See generally Leathers,* —— U.S. at ——–——, 111 S.Ct. at 1443–44, this presumption does not apply to the must-carry provisions. The Court is unpersuaded that mandatory carriage of local broadcasters, as opposed to the specifically targeted differential taxes struck in *Minneapolis Star,* will so cripple cable operators as to leave them unable to exercise their own constitutionally conferred right to inform and entertain the public as they wish. *See Grosjean v. American Press Co.,* 297 U.S. 233, 246–47, 250, 56 S.Ct. 444, 447–48, 449, 80 L.Ed. 660 (1936) (discussing the historical use of differential *taxation* as a means of governmental censorship of the press). Furthermore, specifically targeted differential taxes raise an inference that government has regulated content because it is difficult to imagine governmental purposes unrelated to content that cannot be served by generally applicable means other than differential taxation. *Minneapolis Star,* 460 U.S. at 585, 103 S.Ct. at 1371–72. This inference does not arise with cable carriage requirements, however, because there are plausible legitimate goals that can be served by compelling broadcast carriage that cannot be served by any generally applicable means. The Court thus concludes that the must-carry provisions will not be strictly scrutinized merely because they treat operators and programmers differently from other components of the media.

23. *See* 1992 Cable Act § 2(a)(6) ("[t]here is a substantial governmental and First Amendment interest in promoting a *diversity of views* provided through multiple technology media.") (emphasis added); *Amicus* Brief of the United States Senate at 27 ("[a]lthough cable systems may provide programming on a wide range of subjects, the *diversity of approaches* to those subjects may be reduced [if] control over the selection and development of programming is in the hands of fewer entities.") (emphasis added) *cf. Metro Broadcasting, Inc. v. FCC,* 497 U.S. 547, 570–71, 110 S.Ct. 2997, 3011–12, 111 L.Ed.2d 445 (1990) (equating diversity in ownership of broadcast licenses to diversity of messages available to the public; "it is upon *ownership* that public policy places primary reliance with respect to diversification of content....") (citations omitted, emphasis in original).

But if the must-carry provisions are content-related at all, they are only marginally so, to the point of *de minimis.* Congress may have presumed, on a very non-specific (and unarticulated) level, that there would be some content differences between the subject matter and/or emphasis of the video signals emitted by local broadcasters and those produced by cable programmers. It appears to the Court, however, that Congress' solicitousness for local broadcasters' material simply rests on its assumption that they have as much to say of interest or value as the cable programmers who service a given geographic market audience, not on any recognition that there is a discrete "local" subject-matter. So viewed, the must-carry provisions hardly evince the type of nefarious governmental activity guarded against by the First Amendment generally and the strict scrutiny standard in particular.

Moreover, even if a "local" versus "non-local" dichotomy of message exists, and can be said to be content-related in some abstract way, the cable medium exhibits certain characteristics unique to the way the industry has evolved and is presently structured, and of equally "local" dimensions having nothing whatsoever to do with message. Cable operators have prevailed upon "local" public authorities to license their use of public rights-of-way over which to string their coaxial cable networks, and there are manifestly limits to the number of such licenses likely to be issued. They vie with broadcasters for "local" advertisers. Cable operators have also historically enjoyed the right to retransmit "local" broadcast programming when and to the extent they wished subject only to administratively set royalty fees.

The technology they employ enables a single cable operator to transmit a video signal superior to that of conventional over-the-air transmitters, and to deliver at a "local" television receiver a vastly greater number of channels to watch than all local broadcasters combined. There is, moreover, little competition among "local" cable operators themselves. In short, the term "local" as applied to the cable industry has many implications other than as a synonym for "provincial" as an adjective applied to programming and all were within the contemplation of Congress when it enacted must-carry.

The Supreme Court has observed that "differences in the characteristics of new media justify differences in the First Amendment standards applied to them."[24] *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 557, 95 S.Ct. 1239, 1246, 43 L.Ed.2d 448 (1975); *see Quincy,* 768 F.2d at 1448. *Compare Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 386, 89 S.Ct. 1794, 1804–05, 23 L.Ed.2d 371 (1969) *with Tornillo,* 418 U.S. 241, 94 S.Ct. 2831. Cable has achieved its present market dominance, in large part, due to such "local" factors—artifacts of a sort of the industry's evolution—not because it has delivered an intrinsically better message. Similar factors, benign in themselves, perhaps, and characteristic of many successful industries having supplanted older rivals, have nevertheless lead to regulation of such industries *for economic reasons* when their market powers have reached dangerous proportions.

Absent an indication of a Congressional purpose, whether avowed or covert, to effect a degree of content-control by mandating carriage of "local" broadcasters' signals, the

---

**24.** Although this maxim is oft-repeated, the Supreme Court has infrequently invoked unique media characteristics to justify relaxed scrutiny of content-based regulations. The single notable exception is in the broadcast context, in which the Supreme Court has found content-based, fair access regulation to be justified by scarcity of electromagnetic spectrum space, *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969), and has found limited content-based indecency regulations to be justified by broadcasting's pervasive presence and unique accessibility to children, *FCC v. Pacifica Found.,* 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978). *PruneYard,* arguably, is

also a case in which the Court found that special contextual characteristics of the "California shopping center" justify special First Amendment treatment. *See PruneYard,* 447 U.S. at 87, 100 S.Ct. at 2044. As discussed above, however, *PruneYard* is just as easily explained as a content-neutral case. *See Pacific Gas,* 475 U.S. at 12, 106 S.Ct. at 909–10. The Seventh Circuit apparently has ruled that all regulation of cable speech, whether or not content-based, is subject to relaxed First Amendment scrutiny because of special characteristics peculiar to the cable medium. *Chicago Cable,* 879 F.2d at 1547–49; *Omega Satellite Prods. v. City of Indianapolis,* 694 F.2d 119 (7th Cir.1982).

First Amendment should not unduly inhibit Congress in what clearly appears on its face to be an effort to level the economic playing field in the television industry, at large, even if in doing so it may coincidentally inhibit some freedom of choice of the cable operators as to whose signals are to be carried and under what conditions. The Court accordingly concludes that *O'Brien* and *Rock Against Racism* provide the appropriate standard for determining the constitutionality of Congress' mandatory carriage provisions.[25]

## VI.

■ The inquiry to be made under the *O'Brien–Rock Against Racism* formulation is to ascertain whether the must-carry provisions further a significant government interest, *O'Brien*, 391 U.S. at 377, 88 S.Ct. at 1679; *Rock Against Racism*, 491 U.S. at 798–99, 109 S.Ct. at 2757–58; *see also Quincy*, 768 F.2d at 1454, and whether they are "narrowly tailored" to serve that interest, *O'Brien*, 391 U.S. at 377, 88 S.Ct. at 1679; *Rock Against Racism*, 491 U.S. at 798, 109 S.Ct. at 2757. The narrow tailoring requirement is satisfied if the government's regulation will effectively remedy the condition that the government has identified as in need of correction, and if it does not burden substantially more speech than necessary in doing so. *Rock Against Racism*, 491 U.S. at 799, 109 S.Ct. at 2758.

Congress' objective in enacting the mandatory carriage requirements, it has declared, was to promote fair competition among video "speakers" in order to assure the survival of local broadcasting for the benefit of both those who subscribe to a cable service and for those who do not. *See* 1991 S.Rep. No. 92 at 58; Federal Defendant's Memorandum at 33. Although the D.C. Circuit declined an invitation to rule on whether this is a governmental goal of sufficient significance for *O'Brien* purposes, *see Quincy*, 768 F.2d at 1454, other cases establish that the importance of broadcasting generally, and in particular local broadcasting, to the American public is now beyond dispute.[26] *See United States v. Southwestern Cable Co.*, 392 U.S. 157, 172–73 & nn. 38 & 39, 88 S.Ct. 1994, 2002–03 & nn. 38 & 39, 20 L.Ed.2d 1001 (1968); *National Ass'n of Broadcasters v. FCC*, 740 F.2d 1190, 1198 (D.C.Cir.1984); *see also Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 714, 104 S.Ct. 2694, 2708, 81

---

**25.** The plaintiffs correctly note that the Supreme Court, in *Tornillo*, rejected the suggestion that economic impediments to access justified Florida's right-of-reply law. *Tornillo*, 418 U.S. at 247–57, 94 S.Ct. at 2834–39. But, read in context, the Supreme Court's discussion in *Tornillo* has no application in this case. Importantly, the regulation in *Tornillo* was *expressly* based on content in two ways; it exacted its penalty on the basis of the antecedent publication of one message and it compelled carriage of another. *Tornillo*, 418 U.S. at 256–58, 94 S.Ct. at 2838–40. The government, in *Tornillo*, sought to use economic scarcity as a justification for ensuring that the public had access to messages favorably portraying political candidates who had been criticized in the press. It was in this context that the Court rejected the argument that economic barriers to newspaper access justify content-based compelled speech requirements. In this case, by comparison, the government has sought only to ensure that the public has access to diverse kinds of communications in order to overcome technological, structural, and historic, as well as economic factors creating a bottleneck. This goal is a far cry from the message-specific goal in *Tornillo*, even if marginally content-related.

The Court notes that its conclusion that contextual factors unique to cable require relaxed First Amendment scrutiny of the must-carry provisions even if marginally content-related, depends, to some extent, on Congress' factual findings. The parties have raised the issue of whether the courts should strictly scrutinize a congressional decision that a particular communications medium warrants special First Amendment treatment. The Court finds that it need not resolve this intriguing question. With respect to the factual findings made by Congress, the Court has provided Congress with the level of deference befitting a co-equal branch of government that is well-equipped to take evidence and make findings. *Metro Broadcasting*, 497 U.S. at 569, 110 S.Ct. at 3011; *see also Columbia Broadcasting Sys., Inc. v. Democratic Nat'l Comm.*, 412 U.S. 94, 103, 93 S.Ct. 2080, 2087, 36 L.Ed.2d 772 (1973). The Court, however, has viewed as a matter of law, subject to no deference to Congress, the issue of whether the facts present the need for special First Amendment treatment.

**26.** 1992 H.R.Rep. No. 628 at 50 ("[l]ocal television stations are central to [a competitive system of over-the-air-broadcasting]—they are both the leading source of news and public affairs information for a majority of Americans and the most popular entertainment medium.")

L.Ed.2d 580 (1984); [27] *cf. Metro Broadcasting,* 497 U.S. at 566–68, 572–73, 110 S.Ct. at 3009–10, 3012–13. *See generally* Communications Act of 1934, § 307(b), 48 Stat. 1083.

The plaintiffs submit that even if averting the demise of local broadcasting is deemed an important governmental goal, the factual premise on which the must-carry provisions are based, *viz.,* that local broadcasting is in peril, is incorrect. Citing their own statistics, the plaintiffs contend that broadcasting is alive and well, and has actually grown since the FCC's must-carry rules were struck down in *Quincy.* Oppressive artifices such as must-carry, they say, are unnecessary.

Congress, however, did not agree, and in sharp contrast with the meager record before the FCC when the court of appeals struck down the must-carry provisions in *Quincy* and *Century,* the current must-carry provisions are based on a substantial record assembled by Congress itself. *See generally* 1991 S.Rep. No. 92 at 42–46 (citing Federal Communications Commission, Policy and Rules Division, Mass Media Bureau, Cable System Broadcast Signal Carriage Survey (1988) (staff report)); 1992 H.R.Rep. No. 628 at 50–57 (same). Congress received evidence demonstrating, to its satisfaction, that cable operators, in significant numbers, are denying carriage to local broadcasters, are attaching onerous conditions to their agreements to carry broadcasters, and are exiling broadcasters being carried to remote channel positions. 1991 S.Rep. No. 92 at 42–43; 1992 H.R.Rep. No. 628 at 51. Congress also apparently credited evidence indicating that this unfavorable treatment of broadcasters is

the result of the cable operators' attempts to obtain a competitive advantage, not a function of consumer demand. 1992 Cable Act § 2(a)(12)–(15); 1991 S.Rep. No. 92 at 44.[28] Congress determined that refusal to carry, termination of carriage, and channel repositioning artificially diminish the audiences of local broadcasters, and, in turn, decrease their revenues. 1992 Cable Act § 2(a)(11)–(15); 1991 S.Rep. No. 92 at 44–45, 59; 1992 H.R.Rep. No. 628 at 50–51. In light of all of the evidence, Congress concluded that local broadcast television is not flourishing; it is in serious jeopardy. 1992 Cable Act § 2(a)(16); 1991 S.Rep. No. 92 at 59.

Furthermore, even if the state of the broadcasting industry is not now as parlous as the defendants contend, the Court finds it to be indisputable on this record that cable operators have attained a position of dominance in the video signal distribution market, and can henceforth exercise the attendant market power. The Court does not find improbable Congress' conclusion that this market power provides cable operators with both incentive and present ability to block non-cable programmers' access to the bulk of any prospective viewing audience; unconstrained, cable holds the future of local broadcasting at its mercy. In light of the considerable body of evidence amassed by Congress, and the deference this Court should accord to the factfinding abilities of the nation's legislature, *see Metro Broadcasting,* 497 U.S. at 569, 110 S.Ct. at 3011; *Columbia Broadcasting Sys.,* 412 U.S. at 103, 93 S.Ct. at 2087, the Court must conclude that the danger perceived by Congress is real and substantial.

---

**27.** The Supreme Court, in *Capital Cities,* considered an Oklahoma Law prohibiting state cable companies from carrying out-of-state alcohol advertising. The Court held that the law was preempted by the FCC must-carry provisions in effect at the time. The Court rejected the state's argument that its power to regulate alcohol under the Twenty–First Amendment was paramount to the federal mandatory carriage program. The Court found that the state's interest in regulating alcohol was outweighed by the "substantial federal interest" in protecting broadcast television for those that do not receive cable, and in ensuring diverse video programming. *Capital Cities,* 467 U.S. at 714, 104 S.Ct. at 2708.

**28.** The Senate Committee on Commerce, Science, and Transportation, for example, received evidence indicating that "[i]n almost every instance, [broadcast] stations [that have been repositioned] have been replaced by a cable program service in which the system operator is selling advertising or in which the operator has an equity interest or both." 1991 S.Rep. No. 92 at 44, U.S.Code Cong. & Admin.News 1992, at 1177. The Committee concluded that channel repositioning of broadcasters is "made solely to enhance the competitive position of the cable operator's programming or its advertising availabilities." *Id.*

The plaintiffs also contend that the must-carry provisions are not "narrowly tailored" to accomplish their objective. There seems to be little doubt that the must-carry provisions will be effective in sustaining local broadcasting for the present. Rather than dispute their effectiveness as a means to the end, therefore, the plaintiffs' complaint is that they are overly so; being excessive, they burden speech in instances in which governmental intrusion is unnecessary.

First, they argue that Congress' goal can be achieved by the use of rudimentary technology, (a selector switch, for example), enabling broadcast and cable signals to be equally accessible to cable subscribers who want to watch them; viewer preference will then determine the victor in an idealized "marketplace of ideas." Second, they contend that mandatory cable carriage of *all* local broadcasters is too much of a good thing; it may require an operator to carry signals of broadcasters it would not otherwise carry in a market in which there is actually a surfeit of "local" programming on cable as well as over-the-air. The Court concludes, however, that the must-carry provisions are sufficiently, if not surgically, tailored to Congress' larger economic market-adjusting objective.

■ It is, of course, conceivable that there are less restrictive alternatives that Congress could have employed in its attempt to preserve the vitality of local broadcasting. Importantly, however, under *O'Brien,* the government is not required to settle for means that serve its interests less effectively merely because an alternative might be less burdensome. *Rock Against Racism,* 491 U.S. at 799, 109 S.Ct. at 2758 (citing *United States v. Albertini,* 472 U.S. 675, 689, 105 S.Ct. 2897, 2906, 86 L.Ed.2d 536 (1985)). Congress actually found that input-selector switches were ineffective simply because viewers tended not to use them (a function, perhaps, of viewer inertia as much as viewer preference). *See* 1991 S.Rep. No. 92 at 44–45; 1992 H.R.Rep. No. 628 at 54; *see also* 1992 Cable Act § 2(a)(17). Of more signifi-

cance, however, is that Congress further found that prophylactic measures were necessary to combat the operators' tendencies toward anti-competitive treatment of broadcasters generally. *See* 1991 S.Rep. No. 92 at 41–46; 1992 H.R.Rep. No. 628 at 50–58. Once again, the Court is unwilling to second-guess Congress' determination that the must-carry provisions are necessary to accomplish its objective. Provoking a popularity contest between broadcast and cable programmers was not what it had in mind. *See FEC v. National Right to Work Comm.,* 459 U.S. 197, 207–11, 103 S.Ct. 552, 559–61, 74 L.Ed.2d 364 (1982).

Finally, the Court concludes that the must-carry provisions do not unnecessarily burden a substantial amount of the plaintiffs' own speech. Operators retain complete discretion over much the greater proportion of the channel spectrum on their systems, and non-broadcast programmers are free to compete for access to those channels not dedicated. Under no circumstances will an operator be required, under section 4, to devote more than one-third of its channel capacity to local broadcast use.[29] Similarly, under section 5, operators with less than 36 useable channels need not carry more than 3 non-educational channels, and no operator must carry duplicative non-educational programming. Thus, although the must-carry regulations may reduce the overall quantity of cable operator and programmer speech "opportunities," as it were, it leaves open adequate—in fact, plentiful—alternative, intra-medium channels of communication for cable speakers to deliver whatever messages they choose. The Constitution requires no more. *Compare Heffron v. Int'l Soc. for Krishna Consciousness,* 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981) *with Community for Creative Non–Violence v. Turner,* 893 F.2d 1387, 1393 (D.C.Cir.1990).

### Conclusion

The 1992 Cable Act represents a major congressional effort to bring order and stability to an industry that significantly, and

---

**29.** Furthermore, it appears to the Court that the burdensomeness of the must-carry provisions is illusory in the potentially significant number of cases in which a cable operator receives a carriage request from an operator it would have carried even in the absence of the request.

often profoundly, touches American lives. It is not the province of this Court to pass judgment upon the wisdom of the policies the national legislature has chosen to pursue in such endeavors. That, of course, is a task our system of government commits to the electoral and political processes, and the Court's power in that regard is not enlarged merely because it is invoked in the name of the First Amendment. Simply put, the governmental intention evinced by the must-carry provisions is economic, not ideologic, and raises no suspicion of the type of ominous government interference with speech against which the First Amendment protects.

## VII.

 National Interfaith Cable Coalition ("NICC") seeks to enjoin enforcement of sections 4 and 5 of the 1992 Cable Act on another First Amendment ground, namely, that the provisions violate the Free Exercise and Establishment of Religion Clauses of the First Amendment. NICC's motion is opposed by the federal defendants, who have filed a motion to dismiss, and by several intervenor-defendants, many of whom have filed dispositive motions. The Court concludes that sections 4 and 5 do not violate the Religion Clauses of the First Amendment.

NICC is an "interfaith consortium" of several Judeo-Christian religious groups in the United States. NICC disseminates its messages through the Vision Interfaith Satellite Network ("VISN"), a cable programming operation which competes for carriage on the many cable systems across the country. Like the other programmers, NICC objects to the must-carry provisions because the provisions will reduce the number of cable television channel positions available for use by non-broadcast programmers. By mandating carriage of the religious programming of local broadcasters, the provisions represent a special danger to NICC: it fears that cable operators forced to carry some broadcast religious programming will resist voluntary carriage of additional religious fare.

NICC's Religion Clause challenges center on the premise that the religious programming of local broadcasters is different in kind from NICC's programming. NICC contends that most local religious broadcasters tend to present fundamentalist religious views and are often critical of other viewpoints, while NICC transmits messages that are more "mainstream" and "religiously balanced." NICC argues that the must-carry provisions, by granting preferential treatment to local religious broadcasters, create an illicit liaison between the federal government and particular sectarian interests in violation of the Establishment Clause, and by impeding NICC from reaching its audience and delivering its own religious message, the provisions violate the Free Exercise Clause.

To comport with the Constitution under the now familiar Establishment Clause test, government action must "(1) reflect a clearly secular purpose; (2) have a primary effect that neither advances nor inhibits religion; and (3) avoid excessive government entanglement with religion." *Lee v. Weisman,* —— U.S. ——, ——, 112 S.Ct. 2649, 2654, 120 L.Ed.2d 467 (1992) (citing *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971) and *Committee for Pub. Educ. & Religious Liberty v. Nyquist,* 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973)). Even if the Court were to accept NICC's major premise—that the must-carry provisions disproportionately favor the speech of certain types of religious speakers over others—the provisions do not violate the Establishment Clause. There is no evidence that the must-carry provisions were intended to be anything but religion-neutral—as well as content-neutral; they do not involve the government in religious affairs; and there is no basis for concluding that they will be perceived to represent governmental endorsement of particular religious views or religion in general.

The provisions clearly reflect a secular purpose, as discussed above. There is nothing in the record to indicate that Congress was even aware of any difference in the religious messages of broadcasters and programmers, much less to indicate that must-carry represents a deliberate attempt to favor or disfavor any religious views or practices.

Similarly, the must-carry provisions have a primary effect that neither advances nor inhibits religion. A law does not violate the Establishment Clause merely because it benefits or burdens religious institutions in some way. *Mueller v. Allen*, 463 U.S. 388, 393, 398–402, 103 S.Ct. 3062, 3066, 3068–71, 77 L.Ed.2d 721 (1983); *see Waltz v. Tax Comm'n*, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970). "Incidental" burdens and benefits on religious institutions do not violate the Establishment Clause's primary effect inquiry. *See Widmar v. Vincent*, 454 U.S. 263, 273–74, 102 S.Ct. 269, 276, 70 L.Ed.2d 440 (1981). Central to the primary effect inquiry is whether a reasonable observer would interpret the governmental action to be religion-preferential, *County of Allegheny v. ACLU*, 492 U.S. 573, 592–93, 109 S.Ct. 3086, 3100, 106 L.Ed.2d 472 (1989); *see Widmar*, 454 U.S. at 274, 102 S.Ct. at 276, and there is little danger of such a perception if a law applies to a broad range of entities, both religious and secular. *Widmar*, 454 U.S. at 274–75, 102 S.Ct. at 276–77.[30] *Compare Mueller*, 463 U.S. 388, 103 S.Ct. 3062 (upholding state law providing income tax deduction for tuition, textbook and transportation expenses for parents of children in public as well as parochial schools) *with Nyquist*, 413 U.S. 756, 93 S.Ct. 2955 (1983) (holding unconstitutional public assistance grants to parents of children in nonpublic schools only). The must-carry provisions apply to all broadcasters, without regard to whether their programming contains any religious fare at all. Accordingly, the Court cannot conclude that the primary effect of the provisions is to advance the religious message of local broadcasters or suppress the religious messages of cable programmers.

Nor can the Court conclude that the must-carry provisions foster excessive governmental entanglement with religion. Regulatory legislation creates excessive entanglement only if there is "detailed monitoring and close administrative contact" between the government and sectarian organizations or affairs. *Hernandez v. Commissioner of Internal Revenue*, 490 U.S. 680, 696–97, 109 S.Ct. 2136, 2147–48, 104 L.Ed.2d 766 (1989); *see Mueller*, 463 U.S. at 403, 103 S.Ct. at 3071. There is no basis on which to conclude that the federal government will, in implementing must-carry, become involved in any activity in the nature of religious oversight. To be eligible for mandatory carriage, a broadcaster must meet two basic requirements only; it must be licensed by the FCC and it must operate within a cable operator's television market. 1992 Cable Act § 4. The must-carry provisions accordingly present no danger of entanglement beyond that created by the FCC's broadcast license scheme itself. It is well-settled that "routine regulatory interaction which involves no inquiries into religious doctrine" creates no Establishment Clause infirmity. *Hernandez*, 490 U.S. at 697, 109 S.Ct. at 2147–48.

NICC contends that the must-carry provisions violate the Free Exercise Clause because they prevent NICC from effectively disseminating its religious message. Any burden imposed on NICC's religious practice, however, is merely the incidental effect of a facially religion-neutral law that is generally applicable to all operators, programmers, and broadcasters. Such laws do not violate the Free Exercise Clause. *Employment Div. v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). The must-carry provisions do not, in any way, foreclose dissemination of any religious message or abridge any religious practice.

## VIII.

The Local Community Broadcasters ("LCB"), an intervenor-defendant in these consolidated cases, argues that section 4 of the 1992 Act violates the First Amendment rights to free speech and equal protection rights of low power television ("LPTV") stations. By way or relief, LCB asks this Court to require the FCC to provide expansive mandatory carriage rights, similar to those provided to full power broadcasters, to

---

**30.** As the Supreme Court noted in *Widmar*, "[i]f the Establishment Clause barred the extension of general benefits to religious groups, a church could not be protected by the police and fire departments, or have its public sidewalk kept in repair." *Widmar*, 454 U.S. at 274–75, 102 S.Ct. at 276–77 (citations omitted).

LPTV. Even assuming this Court has the power to provide such a remedy, a dubious proposition, the Court finds that section 4 does not abridge LCB's constitutional rights.

In the late 1970s and early 1980s, the FCC began to implement a program for providing low power television service to viewers across the nation. LPTV operates on the same technological principles as broadcast television, but within a minimal geographic range. In addition, LPTV stations are licensed by the FCC on a secondary basis; they may not interfere with the signals of licensed full power stations, and they must give way to any full power station attempting to use the same frequency. See generally 47 C.F.R. §§ 74.701–74.781 (1992); 1982 LPTV Inquiry, supra note 4. The Commission envisioned LPTV as a less costly alternative for those seeking to enter the television broadcast industry,[31] and saw LPTV as enhancing diversity in the television market, especially for minority broadcasters.[32]

The 1992 Cable Act provides very limited mandatory carriage rights to LPTV. Under section 4, a cable operator is only required to carry a low power station if there are not enough full power commercial broadcasters to fill the one-third channel set-aside imposed by the section. Furthermore, a low power station is eligible for mandatory carriage only if it serves a rural area without full power service. Cable operators with fewer than 36 channels are required to carry one qualified LPTV station, and those with 36 channels or more need only to carry two qualified LPTV stations.

LCB's constitutional claims are similar to those made by the programmers. LCB claims that because the must-carry provi-

sions favor local full power broadcasters by providing them with scarce channel positions and fail to provide similar rights to many rural and all non-rural LPTV stations, the provisions impede the ability of LPTV stations to reach their audiences. LCB also claims that like the programmers, LPTV operators need must-carry to defend themselves against anti-competitive cable operator practices.

Although LCB's claims are similar to those of the programmers, the relief they seek is entirely different. LCB asks this Court to order the FCC to provide LPTV broadcasters with mandatory carriage rights similar to those enjoyed by full power stations. The success of LCB's claim accordingly rests on the untenable position that the must-carry provisions do not violate the constitutional rights of programmers, but do violate the constitutional rights of LCB's members. Furthermore, comparison of the relief sought by LCB and that sought by the programmers makes clear that LCB is not challenging the must-carry provisions on the grounds that they interfere with First Amendment rights; it is, instead, claiming that they have been disparately treated.[33]

■ Unless viewpoint-based, disparate governmental treatment of different speakers, unlike governmental imposition of burdens on expression, does not implicate either O'Brien balancing or strict scrutiny. Message-neutral government decisions to provide benefits to one group of speakers but not others are constitutional if there are rational legislative reasons for distinguishing between groups. Cornelius v. NAACP Legal Defense & Educ. Fund, 473 U.S. 788, 806, 105 S.Ct.

---

31. An Inquiry Into the Future Role of Low Power Television Broadcasting and Television Translators in the National Telecommunications System, 82 F.C.C.2d 47, 80 (1980) (statement of Chairman Ferris).

32. See id.

33. Because LCB asks this Court to uphold a statute that is alleged to burden their expressive activity, their claim is distinguishable from those made in virtually all of the First Amendment cases LCB has cited. Minneapolis Star and Arkansas Writers' Protect, Inc. v. Ragland, 481 U.S. 221, 107 S.Ct. 1722, 95 L.Ed.2d 209 (1987), for

example, both involved challenges to differential taxation schemes applicable to small segments of the press. See generally Leathers, —— U.S. at ————, 111 S.Ct. at 1442–43. The plaintiffs in both cases raised direct First Amendment claims because they challenged the validity of the taxes as either directly burdensome on speech or creating impermissible dangers of governmental censorship. In contrast, the position taken by LCB demonstrates that its sole constitutional concern is that the must-carry provisions fail to provide LPTV with the protection from anti-competitive practices that has been provided to full power broadcasters.

3439, 3451, 87 L.Ed.2d 567 (1985); *Regan v. Taxation with Representation,* 461 U.S. 540, 545–46, 103 S.Ct. 1997, 2001, 76 L.Ed.2d 129 (1983); *accord id.* at 548–51, 103 S.Ct. at 2002–04 (governmental distinctions between groups of speakers subject only to rational basis review under equal protection component of Fifth Amendment unless they are aimed at the suppression of ideas); *Walsh,* 927 F.2d at 1235–37 (same); *id.* at 1238–39 (Williams, J., concurring) (same).[34]

LPTV was conceived and created as a secondary service, and has never enjoyed rights coextensive with full power television. *See 1982 LPTV Inquiry, supra* note 4. Congress's treatment of LPTV is consistent with the government's treatment of LPTV since its inception. Once again, in the absence of any reason to suspect Congress of message-regulation, the Court must uphold Congress' decision not to equalize the free speech rights of LPTV with full power broadcasting unless it is irrational. *Regan,* 461 U.S. at 548, 103 S.Ct. at 2002. Nothing at all appears to be irrational about a legislative policy judgment to treat LPTV as a lesser player in the television market, as it has always been, no matter how innovative, imaginative, or deserving the Court might find LPTV to be.

For the foregoing reasons, it is, this 8th day of April, 1993,

ORDERED, that the plaintiffs' motions for summary judgment on the must-carry claims are denied; and it is,

FURTHER ORDERED, that the federal defendants' motion to dismiss the must-carry claims are granted; and it is,

FURTHER ORDERED, that the motion of intervenor-defendant Local Community Broadcasters for summary judgment on a cross-claim is denied; and it is

FURTHER ORDERED, that the complaints of the plaintiffs and the intervenor-plaintiffs, insofar as they challenge as unconstitutional sections 4 and 5 of the 1992 Cable Act, are dismissed with prejudice; and it is

FURTHER ORDERED, that the complaints of the plaintiffs, insofar as they challenge section 6 of the 1992 Cable Act as not severable from purportedly unconstitutional provisions of that Act, are dismissed with prejudice; and it is

FURTHER ORDERED, that the cross-claim of intervenor-defendant Local Community Broadcasters is dismissed with prejudice; and it is

FURTHER ORDERED, that all other pending motions relating to the constitutionality of sections 4 and 5 of the 1992 Cable Act are denied and dismissed as moot.

SPORKIN, District Judge, concurring.

I concur. I believe that Plaintiffs have not made a case under the First Amendment that would invalidate the must-carry provisions of the 1992 Cable Act. Congress has acted in a highly reasonable and responsible way without trampling the constitutional rights of this nation's citizens. I write separately to emphasize that, because any burden imposed by the 1992 Cable Act on speech is so remote and incidental to the purpose and effect of the 1992 Cable Act, I do not find that the must-carry provisions of the Cable Act of 1992 implicate the First Amendment to the extent to which Plaintiffs claim.

For many years, Congressional policy regarding the telecommunications industry has had a consistent goal: To foster public access to a diverse array of information and views. Congress has found that, to a significant degree because of federal and local governmental decisions in prior years, the cable industry threatens to achieve monopolistic control over the telecommunications market. Thus, a competitive imbalance between the cable and broadcast industries has developed, threatening this important goal.

Congress' finding is based on an exhaustive Congressional record, and deserves the Court's deference. Plaintiffs, under the guise of the First Amendment, would have this Court strike down a statute enacted by Congress in an effort to reign in cable com-

---

**34.** LCB's equal protection claim is based entirely on the somewhat esoteric fundamental rights line of equal protection jurisprudence. Although

LCB indicates that LPTV operations are often run by minority groups, there is no allegation that LPTV operators are a suspect class.

panies' growing economic might and to restore competitive balance in the telecommunications industry. However, this case is not about protecting free speech and the First Amendment. This case is about market domination and control.

I

This case involves two young industries which are essentially less than a half century old. It might be said that invention of television was the first shot fired in the technology revolution, which continues even at this time at an unprecedented pace. From early on, because of the space limitations of the broadcast spectrum, a means had to be devised for allocating stations on a reasonable and fair basis. Congress determined that market forces alone could not make the proper allocation. Thus, right from the start this infant industry was born into a system of heavy regulation.[1]

The cable industry dates back to 1947, when it first emerged as a satellite system. Cable originated as a device to facilitate transmission of television broadcast signals to remote areas.[2] Recognizing the potential of the technology to serve the interests of rural America, Congress began to explore ways to protect and foster the nascent industry.

For several decades, while studying the issue, Congress left regulation of the cable industry to the FCC. In part because of its origin as an adjunct to broadcasting, cable became cloaked in much of the regulatory culture enveloping the broadcast industry.

In the mid–1970s, Congress determined that a number of regulatory and marketplace obstacles had prevented the cable industry from achieving its full potential. To enhance cable's development as a competitive force in the telecommunications market, Congress enacted several laws to support the growth of the industry.

In 1976 Congress passed legislation granting cable systems' copyright licenses to retransmit over-the-air broadcast stations. Public Law No. 94–553, Title I, § 101 (1976), *codified at* 17 U.S.C. § 111. In 1978, in response to cable operators' claim that utility companies were exacting unreasonable rates for the operators' use of utility poles and underground conduits, Congress passed legislation authorizing the FCC to resolve pole attachment disputes between the operators and utility companies. *Public Law No. 95–234, § 6 (1978), codified as amended at 47 U.S.C. § 224.* Through the pole attachment legislation, Congress sought "to minimize the effect of unjust or unreasonable pole attachment practices on the wider development of cable television service to the public."[3]

Meanwhile, since cable often required use of local telephone lines, state and municipal authorities developed local franchise and license systems further regulating cable in their respective markets. Thus, in some

1. The FCC, created in 1934, became the principal vehicle for overseeing the television industry. That agency was given jurisdiction to allocate space on the broadcast band by awarding licenses to those desiring to become broadcasters. These were highly lucrative licenses, which in effect were being given away by the government. Here in this nation of free markets we had a paradox of sorts, namely a mix of government regulation and private enterprise, being dictated by the scarcity of a much sought-after commodity that would confer rights on those selected to receive a "free" Government license to broadcast.

2. John Walson, Sr., is credited as being the founder of cable television. Mr. Walson recently passed away. In his obituary, the following is recounted:

 In 1947, Mr. Walson was the owner of an appliance store in Mahanoy City, near Allen-

town, when he discovered he had trouble selling televisions because the mountains of eastern Pennsylvania interfered with reception.

He erected an antenna tower atop New Boston Mountain overlooking Mahanoy City and ran wire to television sets in his store window. He added amplifiers to the system the next spring, then persuaded residents to hook up for a $100 installation fee and $2 a month.

His company, called Service Electric Cable TV, now has more than 400 employees and serves subscribers in eastern and central Pennsylvania and northwestern New Jersey.

Mr. Walson made cable television history again in 1972, when his company became the first to offer the cable channel Home Box Office to customers. HBO recently presented him with an award recognizing that distinction.

3. S.Rep. No. 580, 95th Cong., 1st Sess. · 14 (1977), reprinted in 1978 U.S.C.C.A.N. 109, 122.

ways, regulation of the cable industry was even more pervasive than that of the broadcast industry in general, often to the detriment of both the industry and its subscribers.

Perceiving a need to establish a national policy for cable television, Congress passed the Cable Communications Policy Act of 1984. Consistent with Congress' long-standing policy regarding the telecommunications market as a whole, the 1984 Act aimed to "promote competition in cable communications and minimize unnecessary regulation that would impose an undue economic burden on cable systems." Public Law No. 98–549, § 2 (1984), *codified at* 47 U.S.C. § 521(6).

The 1984 Cable Act contained several provisions to support cable's competitive position. With regard to local franchising authorities, the Act (1) restricted their ability to regulate rates, allowing them to do so only where there was a lack of effective competition, to be defined by the FCC, (2) limited the obligations they could impose on cable companies and (3) limited their authority to deny renewal of cable franchises.

At the same time, Congress took steps to assure that cable would contribute to the diversity of information available to the public. To thwart the development of local media monopolies and to encourage diversity of ownership of communications outlets, the 1984 Act prohibited ownership of a cable company by the owner of a television broadcast license or telephone company. And to foster a broad diversity of information sources, the Act permitted cities to continue to require in cable franchises that certain cable channel capacity be devoted to public, educational and governmental channels.

As a result of technological innovation and creativity and supported by federal legislation, the cable industry has come a long way in its less than 50 years' existence. Indeed, there is little resemblance between the cable industry of 1947 and that of today. Cable has expanded television communications beyond the wildest imagination of its discoverers. It has virtually eliminated the original problems caused by the space limitation of the broadcast spectrum. Instead of providing access to television broadcasting as its main objective, through creativity and vision, cable now has a free standing existence. It has developed from being the dog's tail to being the tail that wags the dog.

Although cable has brought about much good, there have been excesses which, over the years, Congress has felt compelled to alleviate. In particular, Congress has found that certain anticompetitive, monopolistic behavior on the part of cable companies has accompanied their success, behavior which threatens the vitality of broadcast programming and, therefore, the public interest in access to a wide range of information and views.[4] Thus, while cable has virtually eliminated the problems caused by scarcity on the broadcast spectrum, it has created another scarcity—namely access to the channels on cable systems themselves.

In finding that the must-carry provisions of the Cable Act do not violate the First Amendment, several points merit special emphasis. First, local and federal government regulation played an important role in allowing cable to achieve the position it has today. In addition to the support provided by federal legislation in the 1970s and by the Cable Act of 1984, all too often local franchising authorities granted cable companies an exclusive franchise in their local market.

Second, cable companies enjoying such de facto monopolies wield enormous power over programming in the telecommunications market as a whole. Cable operators can require programmers to provide the operator exclusive carriage rights or a financial interest in the programming as a condition of carriage, and some have done so. The substantial negative impact such conditions have on broadcast stations and television distributors is clear.

Third, as an increasing proportion of the public subscribed to cable (now 60% of American households owning a television set), broadcast stations have become increasingly dependant on cable to reach their television audiences. As cable has become the primary

---

4. *See* Judge Jackson's Opinion, supra, for a discussion of the Congressional findings in this re-gard and the voluminous record supporting them.

means for transmission of all broadcast signals in a locality, it has become imperative for broadcasters to obtain retransmission of their signals by the local cable company. Otherwise, the broadcaster will face a greatly diminished audience. Since it is often the case that cable and broadcast companies are in direct competition for advertising revenues, cable companies have a powerful means by which to adversely affect the financial interests of broadcast stations by refusing to carry or even terminating its broadcast clients.

Congress specifically found that broadcast stations, by being part of the local community, continue to be an important source of local news, public and educational programming and other services critical to an informed electorate. The cable industry's growing monopolistic hold on the telecommunications industry, Congress reasoned, threatens the viability of its only current competition—local broadcasters. Congress concluded that, should local broadcasters be forced off the air, the public interest in being able to obtain access to a broad selection of local news and public and educational programming would be endangered.

## II

Sections 4 and 5 of the Cable Act of 1992 are a form of regulation, designed to lessen the monopolistic threat posed by cable to the telecommunications industry. Contrary to the arguments of Plaintiffs that the 1992 Act limits First Amendment rights on its face, the Act's objective is to enhance the diversity of television voices protected by the First Amendment by neutralizing the adverse effects of cable companies' monopolistic behavior and securing the position of broadcasters'

programs. As an interim measure to accomplish this end, "must-carry" is an integral part of the solution to the problems identified by Congress.[5]

Plaintiffs have come before this Court, not because their freedom of speech is seriously threatened, but because their profits are; to dress up their complaint in First Amendment garb demeans the principles for which the First Amendment stands and the protections it was designed to afford. To the extent to which the First Amendment is implicated, I agree with Judge Jackson that the minimal level of scrutiny outlined in *United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) and *Ward v. Rock Against Racism*, 491 U.S. 781, 109 S.Ct. 2746, 105 L.Ed.2d 661 is the standard the Court should apply.

Plaintiffs raise two arguments in support of their claim. First, the cable operators argue that the must-carry provisions are content-based restrictions compelling them to carry the speech of broadcast stations, and as such run afoul of the First Amendment. Second, the cable programmers argue that the must-carry provisions unfairly prefer the "speech" of broadcasters over their First Amendment rights. Both of these arguments fail.

### A. *Operators' Claim*

It is well-established that under the protections afforded by the First Amendment individuals enjoy the right to speak or not to speak. The government cannot compel an individual to speak. *See, e.g., Wooley v. Maynard*, 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977). The Supreme Court has extended this principle to apply to newspapers and to privately-owned newsletters in

---

5. At some point, technological innovation will enable cable systems to accommodate all broadcasters requesting carriage, thereby rendering "must carry" a problem of the past. Indeed, according to a April 6, 1993 article in the *Washington Post*, Telecommunication's Inc., the nation's largest cable television company, is about to "unveil an ambitious plan to rewire many of its cable systems with 7,000 miles of high-capacity, fiber-optic lines" over the next four years, which eventually will "enable TCI to deliver hundreds of TV channels [and] 'video-on-demand' programming" to its subscribers.

However, while fiber-optic and other technological innovations may be on the verge of a break through which may well cast a different light on Plaintiffs' First Amendment claims, such innovations have not yet realized their potential in the marketplace. In the context of today's technological landscape, the Cable Act of 1992 must be viewed as regulation designed to alleviate the adverse impact of the cable industries' growing monopolistic hold over the telecommunications industry.

*Miami Herald Publishing Company v. Tornillo*, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974) and *Pacific Gas & Elec. v. P.U.C. of California*, 475 U.S. 1, 106 S.Ct. 903, 89 L.Ed.2d 1 (1986), respectively.

While the plaintiffs would have the Court extend the coverage of *Tornillo* and *Pacific Gas & Elec.* to the case at bar, these cases are inapposite to the arguments raised by Plaintiffs.

*Tornillo* broadly recognized the free speech rights of newspapers. *Tornillo* involved state action which penalized identifiable content-based speech and compelled transmission of a particular message. In that case, the Supreme Court once again made it clear that a statute which infringes on a newspaper's editorial rights is highly suspect under the First Amendment.

A continuum exists between compelled speech which is content based and that which incidentally relates to speech. While conflicting signals can be discerned from the case law on when regulations of business enterprises are content-based and when they are not, some First Amendment challenges lend themselves to the following maxim: You know it when you don't see it. This is such a case.

"Content-neutral" regulations are those that "are justified without reference to the content of the regulated speech." *City of Renton v. Playtime Theaters, Inc.*, 475 U.S. 41, 48, 106 S.Ct. 925, 929, 89 L.Ed.2d 29 (1986). In *Renton*, the Court found that a city zoning ordinance restricting the location of adult theaters was not aimed at the content, but rather at the secondary effects such theaters had on the surrounding community.

Perhaps more similar to the case at bar is *Regan v. Taxation with Representation*, 461 U.S. 540, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983). In that case, the Supreme Court found § 501(c)(3) of the Internal Revenue Code, which grants tax-exempt status to organizations organized and operated exclusively for certain statutorily-prescribed pur-

poses, is constitutional. Like must-carry's distinction between cable programmers and broadcasters, § 501(c)(3) clearly makes a statutory distinction between different groups of speakers. Finding "no indication that the statute was intended to suppress any ideas", the Court found that § 501(c)(3) is not a content-based restriction on speech.[6]

Like the ordinance in *Renton* and the statute in *Regan v. Taxation With Representation*, the must-carry provisions plainly "are justified without reference to the content of the regulated speech" and there is "no indication that the statute was intended to suppress any ideas[.]" Must carry simply does not constitute a content-based restriction on cable operators' speech.

The right-of-reply statute in *Tornillo* and the California Public Utilities Commission's directive in *Pacific Gas & Elec.* plainly were based on the content of the regulated speech. But unlike the governmental actions involved in *Tornillo* and *Pacific Gas & Electric*, the must-carry provisions of the Cable Act of 1992 neither "penaliz[e] the expression of particular points of view [nor] force[ ] speakers to alter their speech to conform to an agenda which they do not set." *Pacific Gas & Elec.*, 475 U.S. at 9, 106 S.Ct. at 908. The must-carry provisions do not "restrict [Plaintiffs'] speech to certain topics or views or [ ] force [them] to respond to views that others may hold." *Id.*, at 11, 106 S.Ct. at 909. Must-carry will not "impermissibly require [Plaintiffs] to associate with speech with which [they] may disagree" nor make them "feel compelled to respond to arguments and allegations made by [a local broadcaster] in its messages to [Plaintiffs'] customers." *Id.*, at 15–16, 106 S.Ct. at 911.

Cable operators are left with ample channels to disseminate their own views, and there is nothing about sections 4 and 5 of the 1992 Cable Act which might cause a cable operator to "conclude that, under these circumstances, the safe course is to avoid controversy, thereby reducing the free flow of

---

6. Section 501(c)(3) grants tax-exempt status to organizations "organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or to foster national or international amateur sports competition ..., or for the prevention of cruelty to animals[,]" provided that no substantial part of the activities of which consists attempting to influence legislation or supporting political candidates. 26 U.S.C. § 501(c)(3).

information and ideas." *Id.,* at 14, 106 S.Ct. at 910 (citation omitted). Finally, "if experience with [the must-carry provisions] indicates that they have the net effect of reducing rather than enhancing the volume and quality of coverage, there will be time enough to reconsider the constitutional implications." *Red Lion Broadcasting Co. v. F.C.C.,* 395 U.S. 367, 393, 89 S.Ct. 1794, 1808, 23 L.Ed.2d 371 (1969).

Plaintiffs argue that the prohibition outlined in *Tornillo* and *Pacific Gas & Elec.* against governmental intrusion into the province of editorial discretion provides an independent basis leading the Court to apply strict First Amendment scrutiny to this case. In those cases, the clear content-triggered operation of the governmental regulation threatened to alter the mix of information chosen by the newspaper or newsletter at issue. Since neither a newspaper nor a newsletter is "a passive receptacle or conduit for news, comment, and advertising", *Tornillo,* 418 U.S. at 258, 94 S.Ct. at 2840, such interference with the editor's function triggered heightened scrutiny.

While cable operators do exercise some control and judgment about the mix of overall programming they provide, such judgment does not entail the detail-oriented, content-based decisions made by the editors of newsletters, newspapers or other published sources of information. If the Cable Act compelled the cable programmers to carry the broadcasters' speech, or compelled the operators to relay a particular message, the Act undoubtably would run afoul of the First Amendment. But that is not what is presented in this case. Requiring cable operators to carry the programs of broadcasters, whatever the content of those programs may be, simply does not rise to the level of interference with editorial discretion which impinges on free speech or threatens to alter the mix of information available to the public.

### B. *Programmers' Claim*

Plaintiff programmers challenge the must-carry provisions as impermissibly favoring the speech of broadcaster stations over that of cable programmers.

"Generally, statutory classifications are valid if they bear a rational relation to a legitimate governmental purpose. Statutes are subject to a higher level of scrutiny if they interfere with the exercise of a fundamental right, such as freedom of speech, or employ a suspect classification." *Regan v. Taxation With Representation,* 461 U.S. at 547, 103 S.Ct. at 2001–2002. Programmers and broadcasters clearly are not constitutionally protected groups. And, having found that must-carry does not violate the First Amendment, heightened scrutiny is not warranted in this case.[7] Since I agree with *Judge Jackson* that the 1992 Cable Act passes muster under the rational relations standard of review, this argument fails.

Finally, it must be pointed out that the only challenge before this Court is provided under the First Amendment. No challenge has been made under the taking provision of the Fifth Amendment or any other legal provision. Upholding the 1992 Act against Plaintiff's First Amendment challenge should in no way be taken as an endorsement of the legislation. Indeed, it may be preferable that the market be permitted to regulate itself. Of course, even the most avid proponents of free competition recognize that there cannot be effective free market competition without first eliminating the natural and not so natural monopolies that too many cable companies now enjoy.

### III

Plaintiffs' attempt to substitute Congress' regulation of the cable industry with regulation by the First Amendment is mischievous. It is inconceivable that our forefathers at any time contemplated that the First Amendment would be used to regulate an industry that came into existence over 150 years after the Bill of Rights was adopted.

---

**7.** Moreover, a requirement that cable *operators* carry broadcast programming cannot be said to compel speech on the part of cable programmers. Thus, even if the First Amendment was implicated in this case, it is not clear that the programmers would have standing to assert this claim.

Here, the Government has stepped aside to allow the private sector to perform signal transmission and allocation functions that the Government itself could have reserved for itself, without facing any conceivable First Amendment challenge by broadcasters or other programmers because of the regulatory method chosen. To the extent to which cable is performing a "public utility" function which the Government itself could perform, Congress certainly has the right to adopt reasonable regulations.

Congress has determined that cable companies' growing anti-competitive behavior and monopolistic power threatens the broadcast industry and the public's access to a wide array of local, public and educational programming. Congress decided to address this danger by enacting the Cable Act of 1992. In so doing, Congress was not motivated by a desire to stifle the speech of cable operators or programmers—indeed, ample channels remain open for their use—but by a desire to alleviate the effects of cable companies' monopolies and to preserve the diversity of voices represented by local, public and educational broadcasters. Whether there were other preferable ways of accomplishing Congress' objective is not for the Court to decide. So long as the method adopted by Congress is an appropriate one, it must stand and may not be second guessed by the judiciary. Consequently, I find that the Cable Act of 1992 does not run afoul of the First Amendment.

STEPHEN F. WILLIAMS, Circuit Judge, dissenting:

The must-carry provisions of the Cable Television Consumer Protection and Competition Act of 1992 ("1992 Act") are ably set forth by the majority at pp. 3–6. In essence, they require cable operators to set aside just over a third of their channels for local broadcast stations. (The one-third-plus figure comprises both the commercial stations protected under § 4 of the Act and the noncommercial stations protected under § 5.) In addition, each privileged broadcast station

has a right to its specific "channel position" on a cable system. 1992 Act at §§ 4(b)(6) and 5(g)(5).

In considering cable, Congress confronted a very real problem—one for which it has an easy remedy entirely consistent with the First Amendment. The problem is that cable systems control access "bottlenecks" to an important communications medium. In fact, while there are several thousand cable operators in the United States, only 53 communities are served by more than one operator. Debates, 138 Cong.Rec. S400, S436 (comments of Senator Gorton). There are well-developed regulatory responses to this sort of situation. The "bottleneck" holder may be ordered to serve all parties that meet neutral criteria for service. The Federal Communications Commission itself administers just such regulations in assuring that interstate long-distance telephone companies have access to local telephone networks. 47 U.S.C. § 202; and see, e.g., *MTS and WATS Market Structure Phase III*, 100 FCC 2d 860, 861 (1985) (adopting rules and policies relating to access). Indeed, courts have sometimes taken on the supervision of such compulsory access under the "essential facilities" doctrine of the antitrust laws. *United States v. Terminal Railroad Ass'n*, 224 U.S. 383, 32 S.Ct. 507, 56 L.Ed. 810 (1912). These solutions are, of course, imperfect; for example, they pose tricky pricing issues.[1] But mandatory access rules of this sort give no special privilege to one set of access seekers over another.

In fact, in 1984 Congress adopted provision for neutral, compulsory access to cable in § 612 of the Cable Communications Policy Act of 1984 ("1984 Act"), 47 U.S.C. § 532, a solution somewhat refined in § 9 of the 1992 Act. This provision entitles independent programmers to lease access on cable systems, at reasonable prices to be set by the FCC. Although the channels available for lease under § 612 are limited to a specified proportion of each operator's channels (depending on the total number that the operator possesses, 47 U.S.C. §§ 532(b)(1)(a)–(d)),

---

1. See, e.g., William J. Baumol, "Deregulation and Residual Regulation of Local Telephone Service", Ch. VII, American Enterprise Institute

Studies in Telecommunication Deregulation (draft, March 3, 1993). (Forthcoming as William

Congress remains free to expand the fraction of channels available. The only programmers excluded from the benefits of § 612 are those affiliated with the cable operator, i.e., the very ones who would be the likely beneficiaries of operator discrimination and who are therefore in no need of the law's intervention.

The must-carry provisions, by contrast, extend the privilege of access only to a special class of unaffiliated programmers—local commercial and non-commercial television stations. Congress rested its decision to promote these stations in part, but quite explicitly, on a finding about their content—that they were "an important source of local news and public affairs programming and other local broadcast services critical to an informed electorate." See 1992 Act, § 2(a)(11). Moreover, because of FCC licensing requirements, *every* such local broadcaster is legally bound to "provide programming responsive to issues of concern to its community." *Report and Order*, MM Docket No. 83–670, 98 FCC 2d 1076, 1091–92 (1984). See also National Association of Broadcasters ("NAB") Corrected Memorandum at 24–25 (emphasizing force of mandate to carry local content). In other words, by virtue of provisions of law outside the 1992 Act, the term used by the Act to define the benefitted class *automatically* entails content requirements.

A number of parties challenge these mandates, among them the cable operators who must carry local broadcast stations in place of their own choice of programming, and, even more significantly, the unaffiliated cable programmers, such as Discovery Network, producer of the Discovery and Learning Channels, whose programming will be supplanted. I shall apply current First Amendment analysis to their claims, but before doing so I think it useful to imagine a few hypothetical cases outside the area of cable. If the answers to those hypotheticals are as

clear as I think they are, then—unless there is something terribly special about cable, apart from the bottleneck issue addressed by § 612 of the 1984 Act—the must-carry provisions must fall.

1. The Washington Post develops and patents a special "paper-springer" that enables it to deliver papers at a tiny fraction of others' costs. Assume that paper delivery costs represent a very large share of total costs, so that this technology is a source of overwhelming monopoly power. Congress decrees that The Post must license the paper-springer—but only to publishers of local, neighborhood papers (i.e., not citywide ones). This cuts out The Washington City Paper, The Washington Informer, and The Washington Times.

2. A state is concerned that large shopping centers represent vital gathering places of citizens and that center owners may not willingly allow the sort of leafletting or soap-box oratory associated with a vibrant democracy. Accordingly it requires owners to allow such leafletting and oratory regardless of the leafletters' or speakers' message. See *PruneYard Shopping Center v. Robbins*, 447 U.S. 74 [100 S.Ct. 2035, 64 L.Ed.2d 741] (1980). But, finding that *local* residents are an especially important source of this vibrant debate, it limits the privilege to persons living within *four miles of each shopping center*. This excludes the proverbial "outside agitator".

These scenarios are in fact *less* troublesome under the First Amendment than the must-carry rules; the parties selected to benefit from the bottleneck-breaking rules are defined in content-neutral terms. Here, by contrast, the beneficiaries are local stations that are required by government to include specific content that the government has deemed especially worthy.[2]

J. Baumol and J. Gregory Sidak, "Toward Competition in Local Telephony," M.I.T. Press, 1993).

**2.** Government line-drawing in First Amendment cases can be analyzed both in terms of the distinction between content-based and content-neutral rules, and in terms of underinclusiveness. An underinclusiveness claim, when the classification is not content-based, is extremely weak; typically the law's challenger is saying in essence

that the law should fall because it burdens *too little* speech. See, e.g., *Walsh v. Brady*, 927 F.2d 1229, 1236 (D.C.Cir.1991). This seems counterintuitive, and such claims rarely prevail. See, e.g., *Austin v. Michigan Chamber of Commerce*, 494 U.S. 652, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990). Here, however, the operators, and especially the independent cable programmers, do not say that the law fails because the burden is too narrow; they say it fails because the *beneficiaries* are so narrowly defined, and that the

*Standard of Review.* The standard of review in First Amendment cases usually depends on whether the regulation is content-based, leading to "strict scrutiny", *Arkansas Writers' Project, Inc. v. Ragland,* 481 U.S. 221, 231, 107 S.Ct. 1722, 1729, 95 L.Ed.2d 209 (1987); *Carey v. Brown,* 447 U.S. 455, 461–62, 100 S.Ct. 2286, 2290–91, 65 L.Ed.2d 263 (1980), or content-neutral, leading to more relaxed scrutiny under the formula of *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), as modified in *Ward v. Rock Against Racism,* 491 U.S. 781, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989). Here the statute is content-based under controlling precedent. The must-carry provisions mandate speech: they require cablecasters to carry the speech of local broadcast stations. As the Supreme Court held in *Riley v. Nat'l Fed. of the Blind of North Carolina,* 487 U.S. 781, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988), "Mandating speech that a speaker would not otherwise make necessarily alters the content of the speech. We therefore consider the Act [mandating certain disclosures by charitable solicitors] as a content-based regulation of speech." *Id.* at 795, 108 S.Ct. at 2677. This alteration of content is equally certain here; under the must-carry mandate, cablecasters must replace the programs they would have chosen, regardless of origin, with programs selected by local broadcasters.

The *Riley* Court did *not,* however, immediately proceed to apply strict scrutiny. Rather, addressing a claim that the speech was basically commercial, the Court rejected that view on the ground that the commercial elements were "inextricably intertwined" with fully protected non-commercial speech. *Id.* at 796, 108 S.Ct. at 2677. More generally, it said that the Court's "lodestars in deciding what level of scrutiny to apply to a compelled statement must be the nature of the speech taken as a whole and the effect of the compelled statement thereon." *Id.* While here we have no issue of commercial speech, I

read the *Riley* analysis as a caution against assuming that all compulsions of speech, even fully protected speech, must receive strict scrutiny. We must look further.

Where a government regulation of *conduct* has an "incidental" burden on speech, the Court looks to whether the *interest* asserted by the government "is unrelated to the suppression of free expression", *Texas v. Johnson,* 491 U.S. 397, 407, 109 S.Ct. 2533, 2541, 105 L.Ed.2d 342 (1989) (internal quotations omitted), or, as the Court expressed it later on the page, "unconnected to expression", *id.* Application of a test for "incidental" burdens on speech seems highly artificial here. Given the finite number of cable channels,[3] replacement of the cablecaster's choice of programs with those of local broadcasters suppresses the alternative programs as completely as if Congress had ordered them shut down; there is nothing "incidental" about the burden. Further, one of the interests explicitly asserted by Congress was the benefit of "local news and public affairs programming", 1992 Act, § 2(a)(11); and indeed the class of chosen beneficiaries is defined by other legal provisions as persons *bound* to include some minimum level of local programming content. Moreover, the Court applies strict scrutiny to rules that control editorial discretion, *Miami Herald Pub. Co. v. Tornillo,* 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974), which surely comprises the choice of programs. See *Leathers v. Medlock,* —— U.S. ——, ——, 111 S.Ct. 1438, 1442, 113 L.Ed.2d 494 (1991) (noting that cable "is engaged in 'speech' under the First Amendment, and is, in much of its operation, part of the 'press' "); see also *City of Los Angeles v. Preferred Communications, Inc.,* 476 U.S. 488, 494, 106 S.Ct. 2034, 2037, 90 L.Ed.2d 480 (1986) (noting that cable operators exercise significant editorial discretion).

On the other hand, in *PruneYard Shopping Center v. Robins,* 447 U.S. 74, 100 S.Ct.

---

underinclusiveness thwarts rather than furthers the legitimate purpose of diversity. Even apart from the content-based character of the provision, then, the claim is stronger than the usual one of underinclusiveness.

**3.** There is uncontroverted evidence that 2000 cable systems, serving one-third of all subscribers,

have no excess channel capacity. NCTA Statement of Material Facts at ¶ 6. It is further undisputed that there are many unaffiliated, nonbroadcast programmers seeking access, but who will lose out because of the preferential treatment of broadcasters. *Id.* at ¶ 8; Klein Affidavit at ¶ 6.

2035, 64 L.Ed.2d 741 (1980), the Court assessed mandated speech without any explicit reference to strict scrutiny. The case hardly establishes that speech mandates need not pass such scrutiny, however. Free speech was on both sides of the balance in *Prune-Yard*, for the challenged state rule entitled *anyone* to engage in various expressive activities such as speaking and leafletting at shopping centers. The owner's only First Amendment claim was its right to silence, and the Court found that interest of little weight in context: the owner had dedicated the property to commercial use open to the public; it could readily disassociate itself from the ideas expressed; and the rule made no inroad into editorial functions. *Id.* at 87–88, 100 S.Ct. at 2044. While the Court did not use the language of strict scrutiny, the rule would likely have survived such review, given the state's purpose of assuring expressive opportunities on a completely nondiscriminatory basis, and the weakness of the shopping center's competing speech interests. Thus *PruneYard* cannot reasonably be taken to allow speech mandates to escape strict scrutiny.

The Supreme Court has also developed rules governing the First Amendment evaluation of taxes on the media. While the must-carry regulations are not in form taxes, they are in substance indistinguishable from a tax-subsidy combination—a tax falling exclusively on cablecasters, in an amount large enough to fund a subsidy for local broadcasters to enable them to lease cable channels. The Court has insisted on a "compelling justification" for any use of the taxing power "to single out the press". *Leathers*, —— U.S. at ——, 111 S.Ct. at 1443; see also *Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575, 585, 103 S.Ct. 1365, 1371–72, 75 L.Ed.2d 295 (1983). Where a tax not only singles out the press but "targets a small group of newspapers", even by entirely content-neutral categories, the government must carry a "heavy burden" to sustain the distinction. *Id.* at 591, 592–93, 103 S.Ct. at 1375, 1375–76. See also *Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 107 S.Ct. 1722, 95 L.Ed.2d 209 (1987) (imposing "heavy burden" of justification for tax that singles out a subset of the press for a special tax, based on broad content categories).

*Leathers* itself, of course, upheld a tax statute that distinguished between cable operators and broadcasters, and indeed specified that in the context of a generally applicable tax the distinction was *not* subject to heightened scrutiny. —— U.S. at —— ——, 111 S.Ct. at 1444–47. Although the Court observed broadly that "differential taxation of speakers, even members of the press, does not implicate the First Amendment unless the tax is directed at, or presents the danger of suppressing, particular ideas", *id.* at ——, 111 S.Ct. at 1447, the observation was in the context of a "broad-based, content-neutral sales tax" that fell on virtually every good or service sold in Arkansas, *id.* The treatment of First Amendment values as irrelevant cannot be transported to the context of a burden imposed on one set of speakers for the direct and explicit advantage of a limited class of their competitors—a class whose programming must, as a matter of law, include content of a type specified by the government. Accordingly, I conclude that the proper test is strict scrutiny.

*Application of the test.* To survive strict scrutiny, regulation of speech must serve a "compelling" governmental purpose and its "means must be carefully tailored to achieve those ends." *Sable Communications v. FCC*, 492 U.S. 115, 126, 109 S.Ct. 2829, 2836, 106 L.Ed.2d 93 (1989). First we must identify the government's interests, and then assess the fit between each of those interests and the must-carry requirements.

The Senate Report articulated the congressional interests as follows:

(1) preserving the benefits of local television service, particularly over-the-air television service; (2) promoting the widespread dissemination of information from diverse sources; and (3) promoting fair competition in the video marketplace.

S.Rep. 102–92 at 58, U.S.Code Cong. & Admin.News 1992, at 1191. These purposes are reflected in §§ 2(6)–(15) of the Act. Because this statement of purposes involves some overlap, the analysis will be clearer if we reformulate them as follows: (A) preservation of

open access to cable in order to assure diverse programming (see purposes (2) and (3) above); and (B) preservation of local broadcasting (see purposes (1) and (3) above). This second reason involved not only a desire to promote "local news and public affairs programming", see § 2(a)(11) of the Act, but also a wish to assure that local broadcasters could continue to serve those persons who either did not, or could not, subscribe to cable. I address diversity first, then the preservation of local broadcasters.

*Open Access for Diverse Programming*

I assume that, at least at some level of abstraction, the interest in promoting diversity of views on cable is compelling. With regard to the broadcast spectrum the Court has characterized programming diversity as an "important governmental objective", *Metro Broadcasting, Inc. v. FCC*, 497 U.S. 547, 566, 110 S.Ct. 2997, 3010, 111 L.Ed.2d 445 (1990), and a lengthy passage in *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. at 247–54, 94 S.Ct. at 2834–38, though inconclusive, appears to regard the interest in correcting newspaper monopolies as extremely valuable. In *Tornillo*, however, the Court balked at the state's remedy—a right-of-reply statute—on the ground that it would interfere with editorial discretion. The interference took two forms: *first*, the statute compelled "editors or publishers to publish that which reason tells them should not be published", *id.* at 256, 94 S.Ct. at 2839 (internal quotations omitted), and *second*, it tended to dissuade editors from publishing those controversial statements that would trigger the right of reply, *id.* at 257, 94 S.Ct. at 2839. Framing the case in modern doctrine, the Court may be said to have found the solution too intrusive to satisfy the requirement of careful "tailoring".

Here, too, the fit between the interest and the regulation is extremely weak. It is far from clear that giving local broadcasters an entitlement to be carried will increase program diversity *at all*. Because cablecasters now carry the vast majority of local stations (as explained further below), the must-carry rules may have little effect, but where they have any, it will be only to replace the mix chosen by cablecasters—whose livelihoods

depend largely on satisfying audience demand—with a mix derived from congressional dictate.

Moreover, in considering "fit" one must look at the available alternatives. As the Court said recently in assessing the fit of a statute that burdened commercial speech, "[I]f there are numerous and obvious less-burdensome alternatives to the restriction on commercial speech, that is certainly a relevant consideration in determining whether the 'fit' between ends and means is reasonable." *City of Cincinnati v. Discovery Network, Inc.*, —— U.S. ——, —— n. 13, 113 S.Ct. 1505, 1510 n. 13, 123 L.Ed.2d 99 (1993). Here, one obvious alternative is expansion of the access provisions of § 612 of the 1984 Act. Those access provisions are far less burdensome—in the critical sense of minimizing government interference in the choice of *who* will have access to cable. Under § 612, *all* programmers are eligible for leased access except the ones that don't need it—the affiliates of a cable operator. 47 U.S.C. § 532(b)(1).

Even neutral remedies such as § 612 are subject to challenge under *Tornillo*, as they replace the cablecaster's speech with that of others. But a number of distinguishing factors argue for upholding the leased access solution. First, a relatively large number of channels is available (ranging from the teens up to 40, 50 and more), so that the scope of the monopolization is greater than in *Tornillo*. Second, the channels are discrete, so that viewers will be less likely to attribute all speech on all channels to the cablecaster. And there is no chilling effect on the cablecaster's programming of the remaining channels. Finally, the benefitted group precisely fits the legislative concern—all unaffiliated programmers.

The last is conspicuously missing from must-carry. The difference between the two is the difference between the state rule upheld in *PruneYard Shopping Center* and the hypothetical set forth at the start of this opinion—a *PruneYard*-type entitlement limited to a specific class of would-be speakers defined in terms of their location. Indeed, the must-carry requirements are worse than the *PruneYard* hypothetical, for admission to

the privileged class requires, as a matter of law, the carrying of specific program content.

It is quite true, of course, that Congress found in 1992 that leased access under § 612 has not been as effective as predicted in 1984, pointing to cumbersome enforcement procedures and undue cablecaster control over prices and other conditions of access. See H.Rep. 102–628 at 39–40. But the Report went on to "restate[ ]" the Committee's "belief that access requirements establish a form of content-neutral structural regulation 'which will foster the availability of a diversity of viewpoints to the listening audience'." *Id.* at 40. More important, to the extent that Congress spotted defects in § 612, it set out to correct them. The 1992 Act amends § 612 by clarifying and broadening the FCC's authority to set maximum reasonable rates and other reasonable terms and conditions for access. See 1992 Cable Act, § 9. Given § 612, and Congress's authority to expand its scope, the must-carry rules do not provide a reasonable fit with the diversity rationale.

*Preservation of Local Broadcasting*

The second interest that Congress has invoked is the preservation of local broadcasting. Section 2(a)(10) of the Act is explicit: "A primary objective and benefit of our Nation's system of regulation of television broadcasting is the local origination of programming. There is a substantial governmental interest in ensuring its continuation." In part this interest derived from the local content of such broadcasting—"an important source of local news and public affairs programming." 1992 Cable Act § 2(a)(11). But in addition the interest derived from an indirect concern for the households not served by cable—both those unwilling or unable to pay for the service and the 10% for whom such service is physically unavailable. Here Congress reasoned that if broadcast stations ever lost the advertising revenues attributable to the audiences they reach through cable service, they would be driven from business and thus be unable to provide service for those without cable. There was also special concern that local broadcast stations were exceptionally vulnerable as potential victims of cablecaster bottleneck control, because of their competition with cable for ad-

vertising revenue. See 1992 Act, § 2(a)(14)–(16). I will first address the issue of local content, then the preservation of over-the-air service.

*Local content.* It seems extremely doubtful that forcing local affairs content on First Amendment speakers could ever qualify as a compelling interest (at least outside the special preserve of broadcasting itself, to which I return below). If government "may not select which issues are worth discussing or debating in public facilities", *Police Department of Chicago v. Mosley,* 408 U.S. 92, 96, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1972), it is hard to see why it may do so on private facilities.

Even if by some stretch an interest in local content were "compelling", far less restrictive means are readily available. Congress is free to subsidize favored speech if the market is too weak to sustain the quantity that Congress seeks. See, e.g., *Rust v. Sullivan,* —— U.S. ——, ——, 111 S.Ct. 1759, 1774, 114 L.Ed.2d 233 (1991); cf. *Regan v. Taxation with Representation,* 461 U.S. 540, 544–48, 103 S.Ct. 1997, 2000–02, 76 L.Ed.2d 129 (1983); compare *Arkansas Writers' Project* (striking down content-based tax burden). Given those means, Congress cannot advance specific content by requiring a competing class of First Amendment speakers to carry the favored speech. "[T]he concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment". *Buckley v. Valeo,* 424 U.S. 1, 48–49, 96 S.Ct. 612, 649, 46 L.Ed.2d 659 (1976).

*Preserving over-the-air TV service.* I assume that as an abstract matter government has a compelling interest in assuring access to TV for those unwilling or unable to subscribe to cable, and especially those beyond cable's physical reach. The first difficulty with the argument here is that there is no evidence that this access is in jeopardy. The interest, as the Court said of a concern for breaches of the peace in *Texas v. Johnson,* 491 U.S. 397, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989), simply "is not implicated on this record". *Id.* at 407, 109 S.Ct. at 2541.

The most plausible evidence would be of local TV stations going under and of licensees turning in their licenses. Nothing remotely like that is in sight—the facts show quite the opposite. Plaintiff National Cable Television Association asserts (without contradiction) that in the years since the D.C. Circuit Court of Appeals invalidated the FCC's first effort at must-carry, *Quincy Cable TV, Inc. v. FCC,* 768 F.2d 1434 (D.C.Cir. 1985), the number of commercial broadcast stations has *increased* by 22% (from 919 to 1118), the number of educational broadcast stations by 15% (from 316 to 363), and the number of cities receiving broadcast television by 16% (from 514 to 594). NCTA's Statement of Material Facts ¶¶ 12–14. Thus, not only are licenses not being turned in for want of profitable opportunities, but evidently entrepreneurs continue to seek the additional licenses that the FCC makes available. As a result, they are both deepening and spreading the coverage of over-the-air TV. Whatever risk there may be in the abstract has completely failed to materialize.

Defendants and defendant-intervenors urge in response that this record means little; since *Quincy,* the shadow of possible congressional intervention has fallen across the cable industry, causing operators to be less ruthless than they would be if must-carry were invalidated. Remove the shadow, they claim, and the operators will show their true monopolist colors.

This argument is incurably flawed. If the constitutionally fatal aspect of the must-carry rules is the absence of evidence of any visible threat to the over-the-air TV industry, then the rules would become constitutional the minute the industry was visibly threatened. Accordingly, cablecasters would continue to operate under the same shadow of congressional intervention, and over-the-air TV would continue to thrive. Invalidation of must-carry for want of evidence would preserve the supposedly necessary threat.

Supporters of must-carry thus turn to evidence of (1) instances where cablecasters have actually dropped broadcast stations and (2) structural relationships in the industry, which, they say, indicate the threat is real. Indeed, in its findings, Congress noted a "marked shift in market share from broadcast television to cable television", 1992 Act, § 2(a)(13), and also endorsed the structural argument, *id.* at §§ 2(a)(12), (14–15).

The congressional finding on *actual* effects is not disputed—nor is it supportive of must-carry. That cable has grown faster than broadcast does not in the slightest suggest that broadcast is in peril.

The record before Congress did, however, include evidence of some cable operators' dropping broadcast channels. Specifically, the Senate Report cites evidence that, of 4303 cable systems disclosing data, 869 had dropped one or more local stations in a total of 1,820 instances.[4] S.Rep. 102–92 at 43. Because only half of the more than 8000 cable systems disclosed data, the committee extrapolated to find that approximately 1700 cable systems have denied carriage in approximately 3600 instances. *Id.*

These facts do not support an inference that over-the-air TV is at risk. First, they indicate (by simple subtraction) that 80% of cable systems have never dropped a single local broadcaster. Second, it is impossible to know what to make of the 3600 estimated instances of dropping when we do not know either the percentage of total broadcasters that the figure represents or the character of the broadcast channels dropped. What pertinent data there is on the record states that the average cable system in 1990 carried just over eight local broadcast signals (7% *more* than were carried in 1985). Klein Affidavit at ¶ 13. Taking Congress's figure of over 8000 cable systems, this would indicate that there are at least 64,000 local broadcast signals being carried on cable systems (clearly this figure counts single stations multiple times, just as does the raw figure on drops). Next to this figure, the 3600 instances of droppage[5] do not support an inference of

4. Clearly some stations were dropped on more than one occasion, indicating that being dropped must in many instances have been temporary. We have not been directed to any evidence of how many stations may have been permanently dropped.

5. The record doesn't indicate the time frame within which these drops occurred. If it was a

peril to the broadcast industry or even any segment of that industry. In fact, plaintiff NCTA submits further, uncontradicted evidence that in 1988, well after the FCC must-carry rules had been struck down, 98% of all the broadcast stations that would have qualified for mandatory carriage were still being carried despite the absence of such a requirement. Klein Affidavit at ¶ 12.

There is furthermore no information about the characteristics of the broadcasters actually dropped. Such distinctions are important. Plaintiff Time–Warner Entertainment ("TWE") alleges without contradiction that the must-carry rules will require it to carry, in its Staten Island, New York line-up, not one but *two* stations from Bridgeport, Connecticut. TWE Memorandum in Support of Motion for Summary Judgment at 12. If many of the stations dropped have as remote a link to the dropping cablecaster's market as do these Bridgeport stations, it would explain why the cable operators' right to drop has coexisted with the broadcast industry's continued growth. Thus we have *nothing* to connect the limited evidence of cable operators' actual conduct with any inference that a threat to broadcast is imminent or serious.

The structural argument is that the competition between cable and broadcast for advertising revenue gives cable operators an incentive to drop broadcast stations. See 1992 Act, §§ 2(a)(12), (14–15). (Taken at its best, this theory would lend *no* support to § 5 of the Act (relating to noncommercial TV), as the educational stations do not advertise.) The evidence cited in the Senate Report consists of a projected 17% growth rate in cable advertising revenues. S.Rep. 102–92

at 44. Yet rapid growth in advertising seems easily attributable to the growth of cable, and perhaps some branching into advertising-supported programs. In itself, it shows neither a purpose to undermine broadcast TV nor the start of a campaign to do so. Broadcast television evidently still accounts for 92% of all television advertising revenues. See Hendricks Declaration at ¶ 22(d).[6]

Further, cable television appears to continue to be dependent on local broadcasters as critical suppliers of programming. Congress explicitly found that "broadcast programming that is carried remains the most popular programming on cable systems, and a substantial portion of the benefits for which consumers pay cable systems is derived from carriage of the signals of network affiliates, independent television stations, and public television stations." 1992 Act, § 2(a)(19). In fact, local broadcaster programming accounts for approximately two-thirds of total cable viewing hours. S.Rep. 102–92 at 35. Moreover, the ratio of cable subscription fee revenues to advertising revenue is evidently 25:1. TWE Reply Memorandum in Support of Motions for Summary Judgment at 15. So long as local broadcast programs continue to be so popular, it appears that cable simply cannot afford to drop broadcast channels to any significant degree.

Finally, even if local broadcasters were in perceptible peril, it would not follow that Congress could secure their survival by must-carry provisions. Again, less intrusive alternatives are obvious. First, if evidence of any risk should appear, Congress could get broadcast TV into the homes of cable viewers (and thus preserve the stations' advertising

---

period of years, this even further weakens the inferential chain.

**6.** The National Association of Broadcasters points to evidence before Congress that on some occasions cablecasters repositioned broadcast channels and placed less popular programs at the former broadcast position. NAB Corrected Memorandum, etc. at 22. This is urged as confirmation that cable operators will pursue advertising revenue at the expense of viewer satisfaction. At oral argument cable representatives noted *in response that the data referred to periods* immediately after the switch, when the new programs had little or no reputation with audiences.

In any event, the reasoning of the broadcasters is hard to follow, and seems especially ironic coming from firms that depend exclusively on advertising revenues. Broadcasters might well increase their audiences by dropping advertisements, but no one expects them to do so; it is recognized that they accept detriments to audience satisfaction where justified by increases in net revenue. That cable operators may make some such calculations is no evidence of anti-competitive purpose. In fact, because cable operators' revenues are overwhelmingly due to subscription fees, see below, advertising seems likely to be less common on cable.

revenues) by expanding leased access under the neutral provisions of § 612 of the 1984 Act. Second, if broadcasters' programs were not popular enough to enable them to pay the leasing fees set by the FCC, Congress could subsidize the difference to the extent necessary. Compare *Rust v. Sullivan,* — U.S. at ——, 111 S.Ct. at 1774.

In reaching these conclusions, I do not question Congress's power to engage in critical fact-finding. The degree of deference that we owe such findings is hotly disputed between the parties. *Compare* NCTA Reply Memorandum at 41–42 (citing *Sable Communications of California v. FCC,* 492 U.S. 115, 129, 109 S.Ct. 2829, 2837, 106 L.Ed.2d 93 (1989); *Landmark Communications, Inc. v. Virginia,* 435 U.S. 829, 843–44, 98 S.Ct. 1535, 1543–44, 56 L.Ed.2d 1 (1978), *with* DOJ Answer at 37 (citing *Metro Broadcasting, Inc. v. FCC,* 497 U.S. 547, 572, 110 S.Ct. 2997, 3012–13, 111 L.Ed.2d 445 (1990). My view does not turn on any resolution of that dispute, because the legislative findings simply do not support the inferences needed to sustain must-carry. The problems are that (1) there is *no* finding of any present or imminent harm; (2) the evidence of some dropping of broadcast channels in itself fails to show any widespread problem; (3) the proliferation of local broadcast stations since the end of the FCC's must-carry rules undermines any inference of a problem; (4) the findings as to structure and incentives, taken together with the evidence of cable's dependence on broadcasting, fail to raise the concern beyond the level of speculation; and (5), even if the hazard were perceptible, the record does not address the less intrusive alternatives. If findings as scantily connected to the conclusion as these can justify must-carry, then the door is open—even in the area of First Amendment rights—to exercise of the most naked interest-group preferences. Cf. Cass R. Sunstein, "Naked Preferences and the Constitution", 84 Colum.L.Rev. 1689 (1984).

Thus I conclude that—unless the analysis of First Amendment issues in the special

context of *broadcast* for some reason supervenes—the must-carry provisions violate the First Amendment.

*Proposed Use of Broadcast Analysis*

Some defendants urge the court to use the sort of diluted First Amendment analysis applied to broadcasting in *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969). DOJ Answer at 26; NAB Corrected Memorandum, etc. at 46. Use of the broadcast standards would be completely inappropriate.

The weakened status of broadcasters under the First Amendment arose from the Supreme Court's conclusion that discretionary government allocation of channels was necessary for the orderly use of the broadcast medium—or at any rate that such allocation was not materially more intrusive on First Amendment values than any visible alternative. In *National Broadcasting Co. v. U.S.,* 319 U.S. 190, 63 S.Ct. 997, 87 L.Ed. 1344 (1943), the Court upheld the FCC's so-called "Chain Broadcasting" regulations (aimed at preventing monopolization of radio licenses) against a variety of statutory challenges and a First Amendment claim. "[R]adio inherently is not available to all." *Id.* at 226, 63 S.Ct. at 1014. "That is its unique characteristic, and that is why, unlike other modes of expression, it is subject to governmental regulation." *Id.* Thus, "The right to free speech does not include ... the right to use the facilities of radio without a license." *Id.* at 227, 63 S.Ct. at 1014.

Although the precise question was not before it, the Court appeared to assume that these factors logically entailed discretionary government allocation of licenses, so that such allocation presented no First Amendment problem so long as the choice was not openly based on the applicants' "political, economic or social views, or upon any other capricious basis." *Id.* at 226, 63 S.Ct. at 1014.[7] This of course overlooked content-neutral bases for handling the problems, such as (1) the rule of first possession, which in fact preceded government allocation and

---

7. I use the qualifying adverb "openly" advisedly. Careful research suggests, as anyone would expect, that often the political allegiance of appli-

cants has been critical in license allocation. See, e.g., Lucas A. Powe, Jr., American Broadcasting and the First Amendment 68–84 (1987).

tracked the doctrine of prior appropriation,[8] (2) auctions, and (3) lotteries.[9] These content-neutral alternatives evidently went by default, as those raising the First Amendment claims—the incumbent broadcasters—had no incentive to undermine the system under which they held their own quasi-monopoly licenses. *NBC* of course paved the way for *Red Lion*, which upheld, for the broadcast medium, the sort of government-managed right to respond that the Court later struck down for the print media in *Tornillo*. Compare *Red Lion*, 395 U.S. at 386–401, 89 S.Ct. at 1804–12, *with Tornillo*, 418 U.S. at 247–58, 94 S.Ct. at 2834–40. Here, of course, not even the defendants or defendant-intervenors suggest that discretionary allocation of channels is necessary or even appropriate to preserve access to cable. In the face of § 612, such a claim would be untenable.

Defendants and defendant-intervenors, however, seeking to deny cable operators full First Amendment protection, point to three special characteristics of cable that in their view justify government management of the channels: (1) the cable operators' need for rights-of-way, along or under city streets, in order to lay their cable; (2) the cable industry's prior enjoyment of special government privileges; and (3) the ability of cable operators to engage in "private censorship" against the speech of broadcasters. Neither alone nor in the aggregate do these justify subjecting cable to diminished First Amendment protection.

*Rights-of-way.* State, city and county governments have property interests in the streets, so that the placement of cable commonly requires government consent. There may also be instances where the federal government holds a proprietary interest essential to the laying of cable. These governments may seek to condition their consents on the operators' waiver or abandonment of their First Amendment rights. If so, courts would presumably assess these efforts under the doctrine of unconstitutional conditions. *Elrod v. Burns*, 427 U.S. 347, 357–60, 96

S.Ct. 2673, 2681–83, 49 L.Ed.2d 547 (1976); *Perry v. Sindermann*, 408 U.S. 593, 596–98, 92 S.Ct. 2694, 2697–98, 33 L.Ed.2d 570 (1972); *Western Oil & Gas Ass'n v. Cory*, 726 F.2d 1340 (9th Cir.1984) (state method of calculating charges for use of right-of-way invalidated under negative commerce clause), aff'd 471 U.S. 81, 105 S.Ct. 1859, 85 L.Ed.2d 61 (1985); *Omega Satellite Products Co. v. City of Indianapolis*, 694 F.2d 119, 128–29 (7th Cir.1982). We need not speculate on how such cases would work out. Here the federal government is not attaching conditions to the grant of a property interest; it is acting in a purely regulatory role. It cannot lean on proprietary powers that are out of the picture.

*Prior benefits.* Defendants argue that cable's initial growth depended, perhaps essentially, on government assistance in securing the right to retransmit the programs of broadcast channels, free of charge. See 17 U.S.C. § 111, as amended (compulsory copyright access); see DOJ Memorandum in Support of Motion to Dismiss at 27–28. This history seems completely irrelevant. If the Union Pacific Railroad were to own a newspaper, its history as a recipient of government largesse on a grand scale would surely not condemn it to second-class First Amendment protection. Of course *current* federal government benefits would provide an opportunity for attachment of conditions; but again, just what conditions might prove justifiable in the face of the unconstitutional conditions doctrine is not before us. With the adoption of § 6 of the 1992 Act, Congress gave broadcast stations an unequivocal right to withhold consent to retransmission.

*Cablecasters' power to censor.* Finally, intervenor-defendant NAB argues that cable operators can use their position to censor broadcasters. NAB Corrected Memorandum at 46. This argument amounts to nothing more than a reiteration of the fact that cable operators control a bottleneck. The mere fact that such control might force some programmers to find different ways to reach the public (which all programmers have via

---

8. See Thomas W. Hazlett, *The Rationality of U.S. Regulation of the Broadcast Spectrum*, 33 J.L. & Econ. 133, 147–52, 163 (1990).

9. Cf. 47 U.S.C. § 309(i).

§ 612, and which broadcasters uniquely have via the airwaves) does not give the government any right to force access on behalf of a preferred class of speakers. This follows *a fortiori* from *Tornillo*.

In short, the special character of cable is limited to one feature: bottleneck control of access to an important medium. A straightforward, speech-neutral solution to that problem exists and has already been employed by Congress in § 612 of the 1984 Act, as amended by § 9 of the 1992 Act. I see no constitutional obstacle to the expansion of that solution if Congress should deem it appropriate. Given the availability of that remedy (together with such subsidies as Congress might find suitable), I do not see how Congress can constitutionally deny cable operators the ordinary rights of any First Amendment speaker.[10]

### Conclusion

The must-carry regulations in the 1992 Cable Act clearly burden the protected speech of cable operators, in favor of local broadcasters whose programming content is in material part specified by law. In requiring cable systems to carry a special group of competing speakers, Congress directly, not incidentally, restricts the cable operators' exercise of editorial discretion. None of the interests advanced by Congress supports such a burden. The diversity rationale fits poorly with mandatory carriage of a specific group of programmers, being served with neutrality by § 612's provision for leased access. Although the interest in protecting over-the-air TV for non-cable-subscribers

may be compelling in the abstract, the findings in the record neither indicate any real threat nor suggest any flaw in the less burdensome and obvious means for addressing any such threat. For these reasons, I respectfully dissent, and would declare the must-carry provisions to be unconstitutional abridgments of the First Amendment rights of cable operators and unaffiliated programmers.

---

10. Because of my conclusion on the First Amendment challenge to the must-carry provisions, I do not reach the contention of TWE and Daniels that those provisions also represent an unconstitutional taking of cablecasters' property in violation of the Fifth Amendment. I do not, however, regard the claim as frivolous. The creation of an entitlement in some parties to use the facilities of another, *gratis*, would seem on its face to implicate *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982), where the Court struck down a statute entitling cable companies to place equipment in an owner's building so that tenants could receive cable television. The NAB responds that *Loretto* is limited to "physical" occupations of "real property". See NAB Opposition at 33. But the insertion of local stations' pro-

grams into a cable operator's line-up presumably is not a metaphysical act, and presumably takes place on real property.

NAB also argues that cable operators have no "historically rooted expectation of compensation" for the right to use their cable services, see *Loretto*, 458 U.S. at 441, 102 S.Ct. at 3179, evidently because of (1) local governments' practices of imposing carriage requirements as a condition of granting franchises and right-of-way access, and (2) prior similar federal impositions, seemingly granted in exchange for privileged entitlements to retransmit broadcasters' signals. Both seem of limited relevance for the reasons discussed above in connection with the parallel *Red Lion* theories: the local governments are not involved here, and the federal government has removed the quid for which it now seeks a quo.